[No. G033796. Fourth Dist., Div. Three. Apr. 29, 2005.]

KATHERINE ROMANO, Plaintiff and Respondent, v.
MERCURY INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Horvitz & Levy, Mitchell C. Tilner, John A. Taylor, Jr., Gina McCoy; O'Connor, Schmeltzer & Rose, Lee P. O'Connor, Timothy J. O'Connor and Kimberly I. McIntyre for Defendant and Appellant.

Day, Day & Brown and Christopher J. Day for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.—**

### Background

While driving a 1995 Pontiac Firebird, Katherine Romano was rear-ended by a Toyota Camry driven by Alex Perez, who at the time was insured by a Pennsylvania insurance company (Legion Insurance Company) in financial trouble. The accident occurred in September 2001 and within six months a court in Pennsylvania put the Pennsylvania insurer into "rehabilitation."

While the court order of "rehabilitation" was expressly not a "declaration of insolvency" such as would "activate" Pennsylvania's or any other state's insurance guaranty laws,[1] the order nevertheless made the payment of any claims a matter of the rehabilitator's *discretion.*[2]

On December 30, 2001 (within four months of the accident), the Pennsylvania insurer filed financial statements with the California Department of Insurance showing that its net worth was a *negative* $293 million, and within another 16 months after that (in late April 2003), a California court actually ordered the Pennsylvania insurer into liquidation. Within 23 months of the accident, in late July 2003, a Pennsylvania court formally did the same thing.

Needless to say, Romano did not (and has not) received any money from the now-defunct Pennsylvania insurance company that insured the driver who hit her from behind. She did, however, have *un*insured motorist coverage from her own insurer, Mercury Insurance Company, covering her injuries in cases where an at-fault driver has no insurance "because of insolvency." Mercury, however, denied Romano's uninsured motorist claim on the theory that the Pennsylvania insurer Legion was not an "insolvent insurer" within the meaning of certain California Insurance Code statutes because it was not formally ordered into liquidation by a court within one year of the accident. Romano then instituted this litigation, and each side brought competing summary judgment motions, with the trial court granting Romano's.[3]

 The central issue in the appeal before us is whether Mercury is obligated to pay for Romano's injuries under her uninsured motorist coverage given that there was no formal declaration of insolvency (by either court or state insurance commissioner) within one year of the accident. As we explain below, the operative phrase in both the insurance policy itself and in the

---

[1] The order provided: "This Order shall not be deemed a finding or declaration of insolvency such as would activate the provisions of the Pennsylvania Property and Casualty Insurance Guaranty Act, 40 P.S. §§ 991.1801–991.1820 [*sic*], or the provisions of similar acts of any other state or territory."

[2] The order provided: "The Rehabilitator may, in her discretion, pay claims for losses, in whole or in part, under policies and contracts of insurance and loss adjustment expenses as identified in Section 544(b) of the Insurance Department Act, *supra*, 40 P.S. § 221.44(b), provided, however, that the Rehabilitator shall not have the discretion to pay, and may not pay, bad faith claims or claims for extra-contractual charges or damages."

[3] The judge who did the actual work on the motion was Judge Kim G. Dunning, who made her decision in October 2003. However, before the formal judgment was entered in February 2004, the case was formally reassigned (apparently as a matter of routine panel changes made at the beginning of the year) to Judge Peter J. Polos, who signed the judgment in the wake of Judge Dunning's order granting Romano's motion, hence Judge Polos's name appears in the caption.

Insurance Code is "because of insolvency," which both common law and the Insurance Code would lead a reasonable insured to conclude meant actual insolvency precipitating nonpayment of a claim within a year, *regardless* of whether any court or insurance commissioner took the *formal* step of ordering that insurer into liquidation. By this definition, the reason that Romano wasn't paid was indeed "because of insolvency," thus she was owed coverage under her uninsured motorist coverage from Mercury. Accordingly, we shall affirm the judgment in Romano's favor.

### *The Policy Language*

Here is the insuring clause of the policy as it relates to uninsured and underinsured motorist coverage: Mercury is "To pay all sums which the Insured or his legal representative shall be legally entitled to recover as damages from the owner, or operator of an uninsured motor vehicle because of bodily injury, sustained by the Insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured motor vehicles, provided, for the purpose of this coverage, determination as to whether the Insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement, between the Insured or such representative and the company or, if they fail to agree, by arbitration."

Then comes the *policy's* definition of "uninsured motor vehicle." "Uninsured Motor Vehicle means: [¶] (a) a motor vehicle with respect to the ownership, maintenance, or use of which there is no bodily injury liability insurance or bond applicable at the time of the accident, or there is such applicable insurance or bond but the company writing the same denies coverage thereunder or refuses to admit coverage thereunder except conditionally or with reservation; [¶] (b) an 'underinsured motor vehicle'; [¶] (c) an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein, *because of insolvency* within one year of the accident; [¶] (d) a motor vehicle used without the permission of the owner thereof if there is no bodily injury liability insurance or bond applicable at the time of the accident with respect to the owner or operator thereof; [¶] (e) a motor vehicle whose owner or operator is unknown."[4] (Italics added.)

---

[4] While Romano promptly filed a written claim with the Pennsylvania insurer right after the accident, it appears she never formally heard from it, and our analysis is confined to the clause of the definition that pegs Mercury's obligation when the at-fault driver's insurer is "unable to make payment with respect to the legal liability of its insured within the limits specified therein, because of insolvency within one year of the accident" and not the written denial clause.

*Statutes Addressing the Same Subject*

██ There is, however, a statutory context in which insurers issue uninsured and underinsured coverage. Under Insurance Code section 11580.2 , the Legislature requires all auto policies to have uninsured motorist coverage.[5] Here is what subdivision (a)(2) of the statute requires of such policies:

"Uninsured motorists coverage insures the insured, his or her heirs, or legal representatives for all sums within the limits established by law, that the person or persons are legally entitled to recover as damages for bodily injury, including any resulting sickness, disease, or death, to the insured from the owner or operator of an uninsured motor vehicle not owned or operated by the insured or a resident of the same household." (§ 11580.2, subd. (a)(2).)

A swath of language in subdivision (b) of section 11580.2 tracks categories (a), (b), (d) and (e)—all quoted above—in Mercury's policy: "As used in this section, the term 'uninsured motor vehicle' means a motor vehicle with respect to the ownership, maintenance or use of which there is no bodily injury liability insurance or bond applicable at the time of the accident, or there is applicable insurance or a bond but the company writing the insurance or bond denies coverage thereunder or refuses to admit coverage thereunder except conditionally or with reservation, or an 'underinsured motor vehicle' as defined in subdivision (p), or a motor vehicle used without the permission of the owner thereof if there is no bodily injury liability insurance or bond applicable at the time of the accident with respect to the owner or operator thereof, or the owner or operator thereof be unknown . . . ."

Two paragraphs later, the statute addresses the insolvency issue found in category (c) of Mercury's policy, using the same "because of insolvency" phrase used in the insurance policy: "As used in this section, the term 'uninsured motor vehicle' also means an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein *because of insolvency.* An insurer's solvency protection shall be applicable only to accidents occurring during a policy period in which its insured's motor vehicle coverage is in effect where the liability insurer of the tortfeasor becomes insolvent within one year of the accident." (Italics added.)

---

[5] All statutory references in this opinion are to the Insurance Code unless otherwise designated.

Finally, the statute adds a right of recoupment for the benefit of the paying insurer: "In the event of payment to any person under the coverage required by this section and subject to the terms and conditions of the coverage, the insurer making the payment, shall to the extent thereof, be entitled to any proceeds that may be recoverable from the assets of the insolvent insurer through any settlement or judgment of the person against the insolvent insurer."

■ Section 11580.2 does not define "insolvency." The word, however, is defined in section 985, subdivision (a). That statute defines insolvency equitably, i.e., as not being able to pay obligations when they come due. The statute further defines insolvency *independent* of whether anybody (particularly a court or California's Insurance Commissioner) has declared the insurer to be broke *yet*: "[A]s used in this article . . . 'insolvency' means either of the following: [¶] (1) Any impairment of minimum 'paid-in capital' or 'capital paid in' [or] [¶] (2) An inability of the insurer to meet its financial obligations when they are due."[6]

■ However, the California Insurance Code also includes a set of statutes setting up a mechanism by which covered claims made against the policies of insolvent insurers can be paid. The mechanism is the establishment of the California Insurance Guaranty Association (known in the industry as CIGA). The scheme contemplates that CIGA will pay the "covered claims" of insolvent insurers, and part of the statutes establishing CIGA define the phrase "insolvent insurer." That definition, in contrast with section 985,

---

[6] That's the easy-read version of the statute. Here is the statute quoted completely, plus bracket inserts so that readers needn't scurry off to look up the cross-references: "(a) On or after January 1, 1970, as used in this article [section 985 is part of article 13 of chapter 1 (general regulations) of Part 2 (business of insurance) of the Insurance Code, with chapter 13 focusing on the definition of insolvency] and in subdivision (i) of Section 1011 [section 1011, subdivision (i) provides for the Insurance Commissioner to file and take possession of the assets of insurers for various problems, one of which is subdivision (i): That the last report of examination of any person to whom the provisions of this article apply shows such person to be insolvent with the meaning of Article 13 (commencing with Section 980), Chapter 1, Part 2, Division 1 . . . ."], 'insolvency' means either of the following: [¶] (1) Any impairment of minimum 'paid-in capital' or 'capital paid in,' as defined in Section 36 [which defines paid-in capital to mean, among other things, the lower of the "value of its assets in excess of the sum of its liabilities for losses reported, expenses, taxes, and all other indebtedness and reinsurance of outstanding risks as provided by law"] required in the aggregate of an insurer by the provisions of this code for the class, or classes, of insurance that it transacts anywhere. [¶] (2) An inability of the insurer to meet its financial obligations when they are due."

makes specific reference to a *formal* declaration of insolvency. Section 1063.1, subdivision (b) states: " 'Insolvent insurer' means a member insurer against which an *order of liquidation or receivership with a finding of insolvency* has been entered by a court of competent jurisdiction." (Italics added.)

## The Normal Analysis

Mercury's brief immediately frames the case as one of "statutory construction," i.e., a choice between the definitions set forth in section 985, subdivision (a) and section 1063.1, subdivision (b). The idea is that because the Insurance Code addresses the general problem of insolvency in so many areas (and specifically) in those two statutes, the case before us is a matter of threading our way through a fairly complex statutory analysis rather than applying the *usual* common law rules that govern insurance contracts.

By way of illustration of the point, contrast the "statutory" analysis employed by our Supreme Court in *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674 [274 Cal.Rptr. 387, 798 P.2d 1230], with the common law analysis employed by the same court in *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635 [3 Cal.Rptr.3d 228, 73 P.3d 1205].

In *Prudential-LMI*, the high court was dealing with language in a homeowner's policy which was absolutely *prescribed* by statute, specifically section 2071, which sets forth a "standard form" for all fire insurance policies in California. Thus in analyzing the "one-year suit provision" found in the homeowner's policy because it was placed there by the statute, the court treated the case as one of statutory (as distinct from wholly contractual) construction, and said, "the statute must be construed to implement the *intent of the Legislature* and should not be construed strictly against the insurer (unlike ambiguous or uncertain policy language)." (*Prudential-LMI Com. Insurance v. Superior Court, supra*, 51 Cal.3d at p. 684, italics added.)

By contrast, in *MacKinnon*, the high court looked to traditional common law rules of interpretation in concluding that what is often thought of in the insurance industry as the "absolute" pollution exclusion does *not* include apartment pesticide spraying by a landlord. The question arose because, if the word "pollution" in the absolute exclusion included *every* definition found in

a standard dictionary, one would conclude that apartment pesticide spraying *is* "pollution"—one of the many dictionary definitions of "pollution" is a chemical that causes irritation, and pesticide spraying certainly fits that bill. The unanimous *MacKinnon* court, however, looking to common law principles of interpretation,[7] demonstrated that such an approach would lead to some really silly, and therefore obviously unintended, applications of the pollution exclusion. The *MacKinnon* court therefore rejected the idea that a landlord's attempt to rid an apartment of yellowjackets through insecticide spraying—unfortunately, a tenant died because the pesticide firm hired by the landlord failed to tell the tenant to vacate the apartment—was not covered. (See *MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at pp. 643–645 [context of pollution exclusion], 647–648 [setting forth relevant common law principles] and 649–656 [applying context and common law principles, and specifically noting absurdities in insurer's proposed broad application of exclusion].)

While we will ultimately conclude that the *Legislature* did not intend uninsured motorist coverage triggered "because of insolvency" to require a formal declaration that an insurer is an "insolvent insurer" by way of court order, we should note preliminarily that Mercury's "statutory construction" approach is the only approach that can possibly win for Mercury. If a court were to apply the standard common law approach to insurance contract interpretation as set out in, say, *MacKinnon* or as generally set forth in *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545] (see also Croskey et al., Insurance Litigation (The Rutter Group 2004) ¶ 4:4, pp. 4-1 through 4-2 [giving the basic framework of interpretation of insurance policies]), the only real issue would be whether Mercury's denial of the claim was so lacking in legal force as to be frivolous—this might be a bad faith case instead of a technical coverage case.

Looking at just the policy language and applying the normal, contractual, common law rules, the analysis would go like this: The phrase "because of insolvency" is not specifically defined in the policy, and therefore would either mean one of two things:

---

[7] Of course, in California our common law rules of insurance contract interpretation are grounded in statutory rules of general contract interpretation (see Civ. Code, § 1635 et seq. [setting forth statutory rules of contract interpretation]), but these are general rules, fleshed out by the courts, governing the interpretation of private contracts. Those rules are to be distinguished from cases where the very terms of the *contract itself* is a creature of statute, as say, in section 2071.

It might mean the failure to be paid when an insurer is substantially insolvent or unable to pay its obligations as they come due. Alternatively, the phrase "because of insolvency" would be ambiguous, meaning either (a) substantive insolvency, or (b) formally declared insolvency.

If the first alternative were true, the insured would win *directly*, because the *insured's* position would be supported by the plain language of the policy. (Cf. *American Star Ins. Co. v. Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1327 [284 Cal.Rptr. 45] [unambiguous language unambiguously favored the *insured's* position].) If, however, the second alternative prevailed (that the phrase was ambiguous), the insured would still win, because (a) is an eminently reasonable meaning, and therefore it would be the meaning selected by the court under the usual rules of insurance contract interpretation.

It is *only* by appeal to a *legislative* intent that arguably differs from the result under the normal rules of common law interpretation that Mercury is able to take its denial out of the murky realm of the borderline frivolousness and into the sunlight of a well-framed, good faith, and reasonable argument. Even so, as we will now explain, it still loses.

*The Legislature Meant What It Said When It Said "Because of Insolvency" and Not "Because Owed by an Insolvent Insurer"*

Language is language, and the plain meaning rule is the first step in not only common law insurance analysis (e.g., *Waller v. Truck Ins. Exchange* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]) but also the first step in statutory analysis as well. (E.g., *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175] ["Our first step is scrutinize the actual words of the statute, giving them a plain and commonsense meaning."]; *Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672] ["We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. . . . 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." . . . . Where the words of a statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' "].)

In the present case, the controlling point is that the Legislature prescribed the phrase "because of insolvency" in what it expected of uninsured motorist

coverage, and used a different phrase, "insolvent insurer" in the scheme setting up CIGA. As we have already seen, both "insolvency" and "insolvent insurer" have been specifically defined by the Legislature, those meanings are different, and it is the former which the Legislature used in specifying what was required of uninsured motorist coverage.

■ When the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings. "Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent." (*Craven v. Crout* (1985) 163 Cal.App.3d 779, 783 [209 Cal.Rptr. 649].)

■ And, "Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning." (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 [39 Cal.Rptr.2d 348].)

■ And, "When one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73 [109 Cal.Rptr.2d 1, 26 P.3d 332]; *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130 [13 Cal.Rptr.3d 616] ["We presume the Legislature intended the word 'custody' to have a different meaning from the words 'place' and 'placement.' "]; e.g., *People v. Belmares* (2001) 106 Cal.App.4th 19, 25–26 [130 Cal.Rptr.2d 400] [the fact that the Legislature meant different things in using the words "deter," "prevent," "delay," and "obstruct" in Penal Code provisions governing deterring and resisting officers].)

Mercury has thus founded its argument on a false dichotomy, namely that the trial court had a "choice" between competing definitions of "insolvency" as set forth in section 985 and section 1063.1. This argument ultimately fails because there *are no* competing definitions of "insolvency." There is only *one* definition of "insolvency"—and it is an equitable definition, including simple failure to pay. There is another definition of "insolvent insurer."

If the Legislature had intended to peg uninsured motorist coverage to a formal declaration of insolvency, then in section 11580.2 the Legislature would have defined uninsured motor vehicle by adding language on the order of: "with respect to the legal liability of its insured within the limits specified

therein, because it has been declared an insolvent insurer as defined by Section 1063.1 of this Code within one year of the accident." It goes without saying that the Legislature is certainly not bashful about inserting cross-references into statutes. In fact the Legislature *did* make a cross-reference to section 1063.1's definition of insolvent insurer elsewhere, specifically in section 1063.2, subdivision (c)(1). There, the Legislature used this language: "the tort feasor is uninsured as a result of the insolvency of his or her liability insurer (*an insolvent insurer as defined in this article*)." (Italics added.)

The point is, the Legislature could have *specifically* linked the concept of "because of insolvency" in the uninsured motorist statute to the statutory definition of an "insolvent insurer" as defined in section 1063.1—it had done so elsewhere. But it didn't do so in the uninsured motorist statute, where the Legislature was content to use the word "insolvency," not the phrase "an insolvent insurer as defined in this article [or Code]."

Mercury doesn't have an answer for the simple fact that the operative language is different in the two contexts. Its actual statutory argument, however, is quite sophisticated, centering on the rights of uninsured motorist insurers to recoup payments from CIGA. The core of the argument is that because the paying insurers have the right to recoup one-half of any amount paid because "the tort feasor is uninsured as a result of the insolvency of his or her liability insurer (an insolvent insurer as defined in this article)"—to quote from section 1063.2, subdivision (c)(1))—the nonpayment of a liability claim "is specifically tied" (Mercury's words, not the Legislature's) to the definition of insolvent insurer in section 1063.1, subdivision (b).

The answer to this argument is that Mercury is confusing a right of reimbursement conferred by statute on uninsured motorist insurers that pay claims because of insolvency with Mercury's actual obligation under the language of the relevant statute as tracked by the insurance policy. Yes, insurers do have a statutory *right* of reimbursement after a tortfeasor's insurer has been declared insolvent and CIGA's statutory responsibilities have been triggered. But it doesn't follow that the Legislature *must* have intended the *trigger* for uninsured motorist coverage to be a formal takeover.

The subtext of Mercury's argument is that *surely* the Legislature would not have wanted to leave uninsured motorist insurers in the lurch. *Surely* the Legislature would not have wanted to deprive insurers of reimbursement rights that they would otherwise have when equitable insolvency is the reason the policyholder with uninsured motorist coverage cannot get paid and CIGA is not *yet* available as a potential source of at least partial reimbursement.

We cannot agree. The Legislature might perfectly, and very reasonably, have decided that in cases where an insured is not paid "because of

insolvency" even though the tortfeasor's insurer has not yet been formally declared insolvent, it should be the *insurer* who should bear what economists would call the frictional or transactional costs of trying to pry money out of the financially troubled insurer (or, later on, CIGA).

Consider this: In drafting the legislation, the Legislature had two options for cases like those before us: Either (a) make the uninsured motorist *insurer* bear the burden of first paying the insured and then presenting an equitable claim for contribution against the insolvent-but-not-yet-formally-declared-so insurer, or (b) force the *insured* to wait for formal insolvency so that the insured could eventually make a claim to CIGA. These two options are essentially a choice between making the insured dangle for months waiting for a formal declaration of insolvency while the troubled tortfeasor's insurer doesn't pay its bills or making the uninsured motorist insurer pay first and saddling it with the hassle of dealing with CIGA. Put that way, it is very easy to see that the Legislature would not have chosen (b).

It should be clear here that the real issue is who has to *wait* to be paid, and who should bear the expense of pressing a claim against a financially troubled insurer who is, in fact, not paying. According to Mercury, the waiting must be done by the policyholder, who, after CIGA eventually steps into the picture, would submit an application to CIGA for payment. CIGA would presumably pay—eventually. Then—if there is any difference between what CIGA has paid and the amount of *underinsured* coverage purchased by the policyholder—the insured would make a claim to the underinsured motorist insurer (here, Mercury) for the difference. That's an awful long wait. When deconstructed that way, it is clear that Mercury is trying to shift onto the insured costs in time and claim prosecution that it might otherwise have to bear.

The Legislature's choice was, of course, reasonable. It is more equitable to place the burden of waiting and dealing with a tortfeasor's financially troubled insurer (and later, CIGA) onto the uninsured motorist insurer, whose greater resources would allow it to "front" the money that, by definition, the insured does not have and purchased the insurance to obtain in the first place.

One final theme in Mercury's argument is that as between determining insolvency as a "factual matter" in each case and the—convenient to be sure—bright line provided by the definition of "insolvent insurer" in section 1063.1, the Legislature surely would have preferred the latter. After all, as Mercury notes, "most insureds do not have the resources to research the books of an insolvent insurer or otherwise obtain the information needed to make a factual showing regarding when insolvency has occurred."

This argument fails on its own terms because it is premised on the unfounded (and somewhat counterintuitive) assumption that the Legislature would have put the burden of waiting on the insured out of solicitude *for* the insured. If you carry that logic to its conclusion, it is the sort of solicitude most insureds could do without: Rather than being able to bring a claim against their uninsured motorist insurer and get paid within a reasonable time, supposedly the Legislature would have done them the favor of making them wait for a formal declaration of insolvency, and then fight with CIGA to be paid. Some solicitude.

Also, the argument fails because it assumes that the burden of presenting a claim based on lack of payment "because of insolvency" is a prohibitively expensive one to the insured. The very record before us belies that assumption. Here, for example, an expert hired by Romano was able to ascertain insolvency simply by looking at *public filings* with California's Insurance Commissioner.[8] And it is by no means certain that the law would even require that of an insured presenting a claim, though on that point we will not comment further.[9]

But most dispositively, Mercury's argument is irrelevant because it is inconsistent with the statutory language. Even if there were *good reasons* the Legislature might have written the statutory scheme to require bright-line insolvency for an uninsured motorist claim, the fact is it didn't, and, as we showed above, it certainly knew how.

---

[8] See also Croskey et al., Insurance Litigation, *supra*, ¶ 15:825, p. 15-142 ["Finally, if the stock of an insurer (or its parent or holding company) is publically-traded, the insurer is required to file financial statements with the Securities and Exchange Commission (SEC)."] The Croskey treatise goes on to note that "Many annual and quarterly reports that are filed with the SEC" are available on line, and gives several sources. Also, as Romano's attorneys point out, when an insurer stops paying its creditors or routine claims, it is the sort of news that "everybody knows" about.

[9] Consider the following hypothetical: An insured is rear-ended by a tortfeasor whose insurer, as in the case before us, is substantively insolvent but CIGA has not entered the picture and won't for more than, say, 16 months after the accident. After waiting about six months and hearing nothing, the insured draws the obvious conclusion and makes an uninsured motorist claim. Why shouldn't, under those circumstances, the lack of payment or communication constitute a sufficient showing to bring a claim *at least presumptively* within the uninsured motorist coverage, with the burden shifted to the insurer to show that the tortfeasor's insurer is *not* insolvent? We do *not* substantively comment on this question—it's the next case, not the one before us now—but the very possibility of such a scenario undercuts the idea that *insureds* might prefer Mercury's proposed solution to the "substantively-insolvent-but-not-yet-formally-declared-so" scenario. *If*, for example, the legal answer were that the insurer indeed had the burden of showing a lack of insolvency in that context (and again, maybe that's not the answer, the question remains yet for exploration), then it would follow that the insured would have been relieved of the expense of ascertaining insolvency beyond making its initial claim and waiting a reasonable time before not being paid.

*Disposition*

The judgment is affirmed, and the respondents are to recover their costs on appeal.

O'Leary, J., and Aronson, J., concurred.

On May 27, 2005, the opinion was modified to read as printed above.