[No. C066862. Third Dist. Aug. 31, 2011.]

WILLIAM JOSEPH ROY, JR., Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
MEDICAL BOARD OF CALIFORNIA, Real Party in Interest.

COUNSEL

Nossaman and Robert S. McWhorter for Petitioner.

No appearance for Respondent.

Kamala D. Harris, Attorney General, Carlos Ramirez, Assistant Attorney General, Thomas S. Lazar and Heidi R. Weisbaum, Deputy Attorneys General, for Real Party in Interest.

OPINION

**BUTZ, J.**—The Medical Board of California (the Board) ordered that petitioner William Joseph Roy, Jr., M.D., be publicly reprimanded, after finding he committed professional misconduct by engaging in sexual relations with a patient.

Roy filed a petition for writ of administrative mandate in the superior court, seeking to overturn the Board's ruling. The court denied the petition for writ of mandate. Exercising its independent judgment on the evidence, the trial court upheld the Board's decision, including its finding that Roy violated Business and Professions Code section 726.[1]

Roy filed a petition for writ of mandate in this court, seeking to vacate the trial court's decision. We granted an order to show cause and issued an alternative writ.

Two issues are presented for review: (1) whether substantial evidence supports the trial court's finding that Roy willingly allowed a patient to fondle or grope an intimate part of his body for a substantial period of time;

---

[1] Undesignated statutory references are to the Business and Professions Code.

and (2) if so, whether the conduct constituted an act of "sexual relations" within the meaning of section 726. We answer "yes" to both questions and therefore deny the petition.

## FACTUAL BACKGROUND

On October 23, 2007, the executive director of the Board filed an accusation against Roy charging him with having sexual relations with female patients J.L. and V.H. and committing gross negligence based upon the same conduct.

Roy filed a notice of defense and the case proceeded to a disciplinary hearing before an administrative law judge (ALJ) in October 2008.

*The Evidence at the Administrative Hearing*

### A. *Events Prior to May 18*

The facts surrounding the events *prior* to May 18, 2001 (all further unspecified calendar dates are to that year), are largely undisputed. Hence, we draw our factual summary in this section from the trial court's written ruling.

"Dr. Roy is a highly trained Gynecological Oncologist. . . . [¶] . . . [¶] At the time of the incident in this case V.H. was a 35-year-old woman who worked at a bank in Escondido. She was in the process of getting divorced. In its Decision, the [Board] described her as a 'single, bright, attractive, assertive young woman,' and as a 'strong, independent woman who was seeking adventure.' "

On April 1, V.H. was admitted to the hospital by her primary obstetrician, Dr. Jerome Sinsky. When a CT scan revealed a cystic mass in her midpelvis, Sinsky advised her to have it removed and referred her to Roy to perform the surgery. Roy performed the surgery on April 3. The mass turned out not to be malignant and V.H. was instructed to followup with doctors Roy and Sinsky. On April 24, "Dr. Roy examined V.H. post-operatively and concluded that she was doing well. [He] instructed V.H. to return to his office in four weeks."

On May 8, Dr. Sinsky evaluated V.H. He told her she was recovering well, but instructed her to call Roy's office to determine whether followup was necessary. When V.H. telephoned Roy, he began disclosing details about his personal life. He told her it was his birthday, that his car needed repair, and that he was having difficulty obtaining a California driver's license even though he had been a law enforcement officer. V.H. found this " 'charming' " and "became 'interested' " in him. She decided to create a pretext to speak

with him further. In a phone call, which she initiated, V.H. asked Roy if she could interview him for an English class. Roy agreed, and instructed his nurse to schedule V.H. for the last office appointment on May 18.

## B. *The Events of May 18*

Roy examined V.H. in his office on May 18. He prescribed an antibiotic and "instructed [her] to have a B12 level drawn to find out if her surgery had caused a malabsorption of B12." He also told her to continue seeing Dr. Sinsky "for routine ob/gyn care."

After the office visit concluded, V.H. and Roy agreed to meet at P.F. Chang's restaurant for an early dinner. They took separate cars and met at the restaurant between 4:00 and 5:00 p.m. During dinner, V.H. interviewed Roy on a variety of topics, including his personal history, his hobbies and his reasons for becoming a doctor. After dinner, Roy walked V.H. to her car. The plan was for V.H. to drive Roy to the valet area where his car was parked.

What took place next was the subject of conflicting testimony. V.H. testified that, when they got to her car, she thanked Roy, told him she had a nice time and asked if they could "get together" again. Roy declined, telling her that she was his patient, that he "couldn't be having some sort of relationship with [her]," and that he "couldn't trust himself around [her]." V.H. replied that she felt like she was no longer a patient of his, but Roy was not persuaded.

At this point, V.H. and Roy were standing in front of her car. Roy held out his hand to her to shake hands, but "somehow that became like we were hugging each other." The encounter then took on a much different character:

"[BOARD'S ATTORNEY:] And then what happened?

"[V.H.:] And then things took more of a sexual nature.

"[BOARD'S ATTORNEY:] Were you outside the car or inside the car?

"[V.H.:] Outside.

"[BOARD'S ATTORNEY:] Did they take more of a sexual nature—did you stay outside?

"[V.H.:] Yes.

"[BOARD'S ATTORNEY:] Did you ever get in the car?

"[V.H.:] Yes.

"[BOARD'S ATTORNEY:] Did it continue in the car?

"[V.H.:] Yes, a bit.

"[BOARD'S ATTORNEY:] If you could describe it as heavy petting or something like that?

"[V.H.:] It was something like that.

"[BOARD'S ATTORNEY:] And you were touching him?

"[V.H.:] It was me to him not him to me.

"[BOARD'S ATTORNEY:] He wasn't touching you at all.

"[V.H.:] No.

"[BOARD'S ATTORNEY:] Not at all?

"[V.H.:] Not that I recall.

"[BOARD'S ATTORNEY:] Did he want you to do anything? [¶] . . . [¶]

"[V.H.:] He wasn't asking me to do anything. I was just doing it on my own.

"[BOARD'S ATTORNEY:] Did he tell you not to do it because you were a patient?

"[V.H.:] No, I don't recall that.

"[BOARD'S ATTORNEY:] Did he say, 'Stop, I am getting out of the car?'

"[V.H.:] No, I don't recall that.

"[BOARD'S ATTORNEY:] So you went from hugging—I assume he was also hugging. Hugging connotes a mutual act. Is that true when you said you were hugging both—you had your arms around him and his arms around you?

"[V.H.:] Yes.

"[BOARD'S ATTORNEY:] It went from that to other touching while you were standing and then into the car?

"[V.H.:] Right."

V.H. estimated that the entire "touching" episode lasted an hour, about 15 minutes of which took place inside the car. As they said goodbye, Roy told V.H. that they could never see or speak to each other again "[b]ecause [she] was a patient," and that he would "have to go to confession" the next day.

Later in the hearing, the ALJ elicited the following testimony from V.H.:

"THE COURT: On the occasion when you first got together at [P.F.] Chang's, did you touched [sic] his penis or the area above where the penis would be?

"[V.H.]: Yes, but it was threw [sic] his pants.

"THE COURT: Okay. Did he tell you to stop?

"[V.H.]: No."

According to Roy, when the couple arrived at her car, V.H. said she had "a few more questions," and asked if they could "just sit in the car," for a few more minutes. He agreed and V.H. questioned him further in the car. "At some point, the conversation kind of broke [and] her hand wound up on my thigh. I guess you could say in the crease or groin area. And she stroked my leg and thigh and touched it with the back side of her hand, my privates, but not a direct grab." Roy testified that he was "very startled" and said he needed to leave. V.H. then said, "If I'm never going to see you, can I at least have a hug?" He said "fine," and hugged her before departing. Later in Roy's testimony, he said that V.H. touched him in the groin area for a "[m]atter of seconds. It was kind of putting it there. It was there and, like, a pat and a kind of a rub and that was it. It took me time to react. I was a little bit shocked and asked her [to] stop and got out."

## C. *Post-May 18 Events*

In June 2001, Roy continued to communicate with V.H. about her lab results. In July or August, Roy and V.H. embarked on a personal relationship that lasted until at least September of 2002. The relationship involved telephone calls, some of which involved phone sex. They also went out a few

times and engaged in " 'heavy petting' " and oral sex, but not intercourse. During the relationship, V.H. loaned Roy $37,500, which he eventually repaid.

### D. *Expert Testimony*

Philip DiSaia, M.D., testified as an expert witness for the Board. He testified that V.H. was still a patient of Roy's on May 18, that Roy had engaged in sexual relations with her on that date and therefore his behavior constituted an extreme departure from the standard of care. John Schlaerth, M.D., testified as an expert for Roy. He opined that V.H. was not a patient of Roy's after her office visit on May 18 because she was not under his active medical care. He also opined that V.H.'s intimate touching of Roy later on May 18 without his consent would not constitute grounds for discipline.

### E. *Administrative and Judicial Rulings*

Following the evidentiary hearing, the ALJ issued a proposed decision finding, essentially, that on May 18, while V.H. was a patient of Roy's, they met for dinner at P.F. Chang's. Afterward, they walked to V.H.'s car, where they engaged in "heavy petting" initiated by V.H., during which time she felt his penis through his pants. Roy did not tell her to stop, although he did tell her that she was his patient and they should not be doing this. The ALJ characterized Roy's contrary testimony as "not particularly sympathetic or believable."

Despite these factual findings, the ALJ found that discipline was unwarranted. The ALJ reasoned that the encounter was "relatively brief," that V.H.'s stroking of Roy's penis was "unsolicited, one-sided," and that "[p]hysicians should not be held accountable for the unilateral sexual misconduct of their patients."[2]

The Board filed a notice of nonadoption of the ALJ's decision and the parties were allowed to submit arguments for and against modification of the proposed order.

On July 1, 2009, the Board issued a decision after nonadoption, finding there was good cause to impose discipline under sections 726 (sexual

---

[2] With respect to the charges involving patient J.L., the ALJ found that, although Roy became involved in a sexual relationship with her, the relationship did not become intimate until after she had ceased being Roy's patient. The charges pertaining to J.L. were not pursued further and therefore the evidence relating to them is not recited here.

relations with a patient) and 2234, subdivision (b) (gross negligence), based upon the events that occurred in the parking structure near P.F. Chang's on May 18. As a sanction, Roy was publicly reprimanded and ordered to take a course in ethics and participate in the "Professional Boundaries Program." At Roy's request, the Board granted reconsideration of its decision and permitted a new round of briefing. The Board's "Decision After Reconsideration," reaffirmed the findings of its original decision and imposed the same discipline.

Roy then petitioned for writ of administrative mandate in the superior court. (Code Civ. Proc., § 1094.5.) He sought an order vacating the Board's decision, claiming the Board prejudicially abused its discretion and that its decision was unsupported by the weight of the evidence.

The trial court filed a lengthy written order denying the petition. After upholding the Board's finding that V.H. was still a patient of Roy's on May 18, the court determined that the "critical factual issue" was whether V.H. sexually groped Roy without his consent, or whether Roy willingly permitted her to grope him, as the Board found. Agreeing with the Board that V.H. was a more credible witness than Roy, the court found that the evidence was sufficient to support a finding that Roy permitted V.H. to grope him (including touching his penis over his clothing) and did not tell her to stop.

The trial court also agreed with the Board that the conduct between V.H. and Roy constituted "sexual relations," which the court construed as the "touching of an intimate part of . . . another for the purpose of sexual arousal or gratification." The court upheld the Board's finding that the groping went on for "at least a few minutes," and perhaps longer. It therefore sustained the Board's legal conclusion that Roy had engaged in "sexual relations" with V.H., warranting discipline under section 726.

On the other hand, the trial court found that the evidence did not support the Board's finding of "gross negligence" and therefore struck that part of the Board's decision. However, because there was "no real doubt" that the Board would impose the same discipline even without a gross negligence finding, the court found it unnecessary to remand to the Board for further proceedings regarding penalty.

Following the judgment denying his petition, Roy petitioned this court for writ of mandate. We issued an order to show cause, granted the alternative writ of mandate, and stayed further proceedings pending consideration of the merits of the case.

## DISCUSSION

### I. The Standard of Review

Roy's petition for writ of administrative mandate challenged the Board's discipline of his physician's license for violating section 726. The case of *Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757 [117 Cal.Rptr.2d 445], contains a succinct summary of the applicable principles of review: "After an administrative agency imposes discipline on a professional licensee, the trial court to which application for mandate is made exercises its independent judgment on the facts. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–146 [93 Cal.Rptr. 234, 481 P.2d 242]; *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 789 [72 Cal.Rptr.2d 624, 952 P.2d 641].) After the trial court exercises its independent judgment in reviewing the facts, the appellate court confines itself to determining whether substantial evidence supports the trial court's findings. The appellate court, however, independently exercises its ability to decide issues of law. (*Marek v. Board of Podiatric Medicine* (1993) 16 Cal.App.4th 1089, 1095–1096 [20 Cal.Rptr.2d 474].)" (*Griffiths*, at pp. 767–768.)

Roy's petition raises two distinct issues: First, whether the trial court's finding that Roy willingly permitted V.H. to fondle[3] his "private area" for a substantial period of time is supported by substantial evidence in the record; and, second, if the evidence supports such a finding, whether it provides a legally sufficient basis for concluding that Roy engaged in "sexual relations" with a patient[4] within the meaning of section 726. Resolution of the first issue is governed by the substantial evidence rule. Resolution of the second requires the interpretation of a statute, and is therefore subject to independent review by this court. (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 604 [41 Cal.Rptr.3d 686].)

---

[3] The trial court used the word "grope" as a term of art to mean that V.H. touched an intimate part of Roy's body for the purpose of sexual gratification. However, "grope" often implies an act performed against the other person's will. For example, the online Oxford English Dictionary defines "grope" as "[to] informal[ly] feel or fondle (someone) for sexual pleasure, *especially against their will*: [E.g.:] [*H*]*e was accused of groping office girls*." (<http://oxforddictionaries.com/definition/grope?region=us> [as of Aug. 31, 2011], italics added.) We shall therefore use the term "fondle," which we interpret to mean the caressing or stroking of a *willing* participant for sexual arousal or gratification: E.g.: "[*S*]*troke or caress lovingly or erotically*." (<http://oxforddictionaries.com/definition/fondle?region=us> [as of Aug. 31, 2011], italics added.)

[4] Even though he raised it as his principal defense at the administrative level, Roy no longer contests the finding by all three tribunals that at the time of the events of May 18, V.H. was still his patient. We thus dispense with any further discussion of that issue.

## II. Analysis

### A. *Substantial Evidence*

Section 726, which governs the conduct of physicians and surgeons, provides, in pertinent part: "The *commission of any act* of *sexual* abuse, misconduct, or *relations* with a patient, client, or customer constitutes unprofessional conduct and grounds for disciplinary action for any person licensed under this division . . . ." (Italics added.)

Roy claims the Board's finding that he allowed V.H. to fondle him for "at least a few minutes" on May 18 was "based entirely on speculation, conjecture, or mere possibilities" and is therefore unsupported by substantial evidence.

 Roy's argument has been forfeited by the totally one-sided statement of facts appearing in the factual portion of his petition. As we stated in *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674 [39 Cal.Rptr.3d 189]: " 'When [a petitioner] challenges an administrative decision as unsupported by substantial evidence in light of the record as a whole, it is [the] [petitioner's] burden to demonstrate that the administrative record does not contain sufficient evidence to support the agency's decision.' [Citation.] A recitation of only the part of the evidence that supports the [petitioner's] position 'is not the "demonstration" contemplated under the above rule. [Citation.] Accordingly, if, as [petitioner] here contend[s], "some particular issue of fact is not sustained, [he is] required to set forth in [his] brief *all* the material evidence on the point and not merely [his] own evidence. Unless this is done the error is deemed to be waived." ' " (*Id.* at p. 749, some italics omitted, quoting *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

Nevertheless, in the interest of justice, we shall address Roy's argument on the merits. The trial court found "the weight of the evidence" "supports the finding that Dr. Roy permitted V.H. to grope him" "for at least a few minutes—probably longer—and that he did not immediately tell her to stop." The court rejected Roy's claim that V.H.'s testimony about "heavy petting" carried no weight, noting that the term was "commonly understood to mean stimulating sexual contact between two people short of intercourse, including touching of erogenous zones over clothing."

In attacking the court's reasoning, Roy points out that V.H. actually said that they engaged in *"something like"* heavy petting, and she never defined what she meant by that term. (Italics added.) We are not persuaded.

"In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76 [72 Cal.Rptr.3d 520].)

We emphasize at the outset that V.H.'s testimony about "heavy petting" cannot be viewed in a vacuum. The testimony must be considered in proper context and along with all of the evidence in the administrative record.

The evidence demonstrated that V.H. and Roy were romantically interested in each other prior to May 18. In a phone call, during which he notified V.H. about her test results, Roy inappropriately began divulging details of his personal life to her, which she found "really interesting," and attracted her to him. When V.H. asked if she could interview him, Roy not only agreed but suggested they meet at a restaurant and arranged for V.H.'s medical appointment to be the last one of the day.

After dinner, V.H. and Roy walked to her car inside a parking structure. As they stood in front of her car, V.H. told Roy she had a nice time and would like to see him again. Roy declined, stating that "he couldn't trust himself" around her and reminding her that she was still his patient. This sequence shows that Roy was aware of his attraction to V.H., as well as the impropriety of becoming physically intimate with a patient.

Roy's attempt to resist temptation failed. When he held out his hand to V.H. to shake her hand, the couple ended up "hugging each other." According to V.H., this mutual hug then became "sexual" in nature. She described it as "something like" heavy petting that went on for about *45 minutes*, and continued inside V.H.'s car for approximately 15 more minutes. Inside the car, V.H. touched Roy's penis through his pants. At no point during the entire hour-long episode did Roy tell her to stop. When it ended, Roy told V.H. they could never see each other again and that he needed to go to confession the next day. However, a few weeks later, V.H. and Roy become involved in an intimate personal relationship, which included "petting," phone sex and oral sex.

Roy's testimony that the entire fondling of his private parts consisted of a "pat" or "rub" lasting only a matter of seconds, that he was "shocked" by the behavior and that he immediately put a stop to it by getting out of the car was disbelieved by the ALJ, the Board, and the trial court. We cannot reweigh

witness credibility. (*Uriarte v. United States Pipe & Foundry Co.* (1996) 51 Cal.App.4th 780, 791 [59 Cal.Rptr.2d 332].)

Although V.H. did not describe the incident with anatomical precision,[5] it must be kept in mind that "[s]ubstantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 [254 Cal.Rptr. 552].)

We conclude the direct testimony of both percipient witnesses, as well as circumstantial evidence derived from events before and after May 18, gives rise to the following reasonable inferences: (1) V.H. and Roy were sexually attracted to each other, an attraction that led to their dinner date at P.F. Chang's; (2) Roy was ambivalent about becoming romantically involved, because he knew V.H. was his patient; (3) their "goodbye" handshake turned into a mutual hug, which became sexual; (4) that after 45 minutes of sexual "hugging," the couple retreated to the privacy of V.H.'s car, where she engaged in more overt sexual conduct, including the fondling of his penis through his pants; and (5) Roy voluntarily submitted to V.H.'s advances by allowing the fondling to go on for a significant period of time, perhaps as long as 15 minutes, without once telling V.H. to stop.

Contrary to Roy's contention, we conclude that the Board's findings were not based on speculation or conjecture, but on reasonable inferences derived from the entire body of evidence in the administrative record.

### B. *Roy's Misconduct Constituted "Sexual Relations" Under Section 726*

Although the argument is not well developed, Roy appears to claim that *even if* the Board's finding that Roy allowed V.H. to fondle him for "at least a few minutes" was adequately supported by the record, it was not sufficient to warrant discipline under section 726. The gist of Roy's argument is that, because the fondling was entirely unilateral and there was no substantial evidence that *he* touched V.H. in an intimate part of *her* body, the conduct did not satisfy the statutory definition of "sexual relations."

To resolve this issue, we must ascertain what the Legislature meant by the term "sexual relations." If the term is clear and unambiguous on its

---

[5] At this point, we must admonish the Board's counsel for a feeble and inadequate direct examination. Given the sensitivity of the subject matter, V.H.'s answers were, perhaps understandably, vague and euphemistic. However, Roy was facing disciplinary charges based upon charges of *sexual misconduct*. This was no time for false modesty. When V.H. was timid or unclear in her answers, it was the responsibility of counsel to probe further so as to leave no doubt about the nature of V.H.'s testimony. Counsel's questioning in this respect left much to be desired.

face, the plain meaning rule applies, and there is no need for construction. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) But the term "sexual relations" is anything but plain. On the contrary, it is susceptible to a variety of interpretations. We therefore " 'resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.[6] [Citation.] In such circumstances, we " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' " (*California Teachers Assn. v. Governing Bd. of Hilmar Unified School Dist.* (2002) 95 Cal.App.4th 183, 191 [115 Cal.Rptr.2d 323].)

Section 726 says, "The commission of *any act* of *sexual* abuse, misconduct, or *relations* with a patient, client, or customer constitutes unprofessional conduct and grounds for disciplinary action [of a licensed physician]." (Italics added.) Although the statute does not define "sexual relations," the Legislature did leave us some clues as to its intended meaning.

As the trial court pointed out, the Legislature *did* define the term "sexual relations" in a closely related statute governing attorney discipline, section 6106.9. (Stats. 1992, ch. 740, § 1, p. 3559.) Section 6106.9, which was enacted *after* section 726, provides in pertinent part that it "shall constitute cause for the imposition of discipline of an attorney within the meaning of this chapter for an attorney to do any of the following: [¶] (1) Expressly or impliedly condition the performance of legal services for a current or prospective client upon the client's willingness to engage in *sexual relations* with the attorney. [¶] (2) Employ coercion, intimidation, or undue influence in entering into *sexual relations* with a client. [¶] (3) Continue representation of a client with whom the attorney has *sexual relations* if the sexual relations cause the attorney to perform legal services incompetently in violation of Rule 3-110 of the Rules of Professional Conduct of the State Bar of California, or if the sexual relations would, or would be likely to, damage or prejudice the client's case." (§ 6106.9, subd. (a)(1)–(3), italics added.)

Unlike its older counterpart, which does not define the term, section 6106.9 states that "For the purposes of this section, 'sexual relations' means sexual intercourse or *the touching of an intimate part of another person for the purpose of sexual arousal, gratification, or abuse.*" (§ 6106.9, subd. (d), italics added.)

This phraseology is by no means sui generis. Similar language appears throughout the Penal Code. (See, e.g., Pen. Code, § 243.4, subd. (a) [any

---

[6] On our own motion, we take judicial notice of the legislative history materials discussed in this part of the opinion. (Evid. Code, §§ 452, 459; *People v. Indiana Lumbermens Mutual Ins. Co.* (2010) 49 Cal.4th 301, 309, fn. 6 [110 Cal.Rptr.3d 4, 231 P.3d 909].)

"person who touches an *intimate* part of another person . . . for the *purpose of sexual arousal, sexual gratification, or sexual abuse*" under specified circumstances is guilty of sexual battery (italics added)]; Pen. Code, § 289, subd. (k)(1) [intentional penetration of "the defendant's or another person's genital or anal opening *for the purpose of sexual arousal, gratification, or abuse*" by a foreign object qualifies as lewd and lascivious conduct (italics added)]; Pen. Code, § 11165.1, subd. (b)(4) [sexual assault includes "intentional *touching of the genitals or intimate parts* . . . or the clothing covering them, of a child, or of the perpetrator by a child, *for purposes of sexual arousal or gratification.*" (italics added)].)

Interestingly, the 1993 Senate Bill No. 743 (1993–1994 Reg. Sess.) (Stats. 1993, ch. 1072, § 1, pp. 5923–5924), which amended section 726 by broadening its scope,[7] also extended section 729 to cover not only psychotherapists, but also physicians and surgeons (Stats. 1993, ch. 1072, § 2, pp. 5924–5925). (See Dept. of Consumer Affairs, Enrolled Bill Rep. on Sen. Bill No. 743 (1993–1994 Reg. Sess.) Sept. 17, 1993, pp. 1–2.) Section 729 imposes liability on designated professional practitioners for the *criminal* offense of "[s]exual exploitation," punishable as either a misdemeanor or a felony. (§ 729, subd. (b)(3).) However, the statute nowhere uses the term "sexual relations." Instead, it provides that any physician, surgeon or other designated practitioner "who engages in an act of sexual intercourse, sodomy, oral copulation, or *sexual contact* with a patient or client . . . is guilty of sexual exploitation by a physician and surgeon [or other professional]." (§ 729, subd. (a), italics added.) This section further provides, "For purposes of this section: [¶] . . . [¶] . . . '[S]exual contact' means sexual intercourse or the *touching of an intimate part of a patient* for the purpose of sexual arousal, gratification, or abuse." (§ 729, subd. (c)(3), italics added.)[8]

---

[7] First enacted in 1979 (Stats. 1979, ch. 955, § 1, p. 3294), section 726 in its original form required that, to be actionable, a licensed physician's sexual misconduct with a patient had to be "substantially related to the qualifications, functions, or duties of the occupation for which a license was issued." (See Historical and Statutory Notes, 3A pt. 1, West's Ann. Bus. & Prof. Code (2003 ed.) foll. § 726, p. 325.)

The 1993 amendment to section 726 deleted the "substantially related" language quoted above in response to a 1992 case which held that a physician's sexual affair with his patient arising solely out of "mutual friendship and affection that formed outside the office" would not be grounds for discipline under former section 726 (*Gromis v. Medical Board* (1992) 8 Cal.App.4th 589, 598–599 [10 Cal.Rptr.2d 452]). (Dept. of Consumer Affairs, Enrolled Bill Rep. on Sen. Bill No. 743 (1993–1994 Reg. Sess.) Sept. 17, 1993, p. 2.)

[8] Subdivision (c)(4) of Business and Professions Code section 729 provides that " '[i]ntimate part' and 'touching' have the same meanings as defined in Section 243.4 of the Penal Code." Subdivision (g)(1) of section 243.4 defines "[i]ntimate part" as "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female." "Touch[ing]" is defined in subdivision (e)(2) of section 243.4 as "accomplished directly, through the clothing of the person committing the offense, or through the clothing of the victim."

Of course, since there was no substantial evidence that Roy touched an intimate part of V.H.'s body, there was no "sexual contact" predicate for criminal liability as defined in section 729. However, Roy was not charged with violating section 729, he was charged with committing an act of "sexual relations" under section 726.

█ As indicated previously, at the same time the Legislature made it a criminal offense for physicians and surgeons to engage in "sexual contact" with a patient (requiring that the touching be done by the doctor), it retained the term "sexual relations" as a predicate for disciplinary action against a practitioner's license in section 726. " 'Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent.' [Citation.] [¶] And, 'Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning.' (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 [39 Cal.Rptr.2d 348].)" (*Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1343 [27 Cal.Rptr.3d 784] (*Romano*).)

Because the Legislature retained the broad, general term "sexual relations" as a ground for disciplinary action in section 726, while employing the narrower and more strictly defined term "sexual contact" as a predicate for criminal liability upon the same class of practitioners, we must presume it intended the terms to mean two different things.

Acceptance of Roy's claim that a unilateral, unreciprocated sexual fondling of a physician by a patient does not fall within the definition of "sexual relations" would compel the conclusion that the Legislature meant "sexual relations" and "sexual contact" to have the *same meaning*, despite the Legislature's use of two different terms within the same statutory framework. Such a hypothesis is contrary to the settled rule that "[w]hen the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings." (*Romano, supra*, 128 Cal.App.4th at p. 1343.)

We agree with the trial court that the statutory definition of "sexual relations" found in the closely related attorney discipline statute, section 6106.9, is a useful metric for assessing liability under section 726. Subdivision (d) of section 6106.9 defines the term " 'sexual relations' " to mean either sexual intercourse or "the touching of an intimate part of another person for the purpose of sexual arousal, gratification, or abuse." This definition does not distinguish between the touching of a client by an attorney or the reverse

situation, nor does it specify whose sexual desires need to be aroused or gratified. The term applies, without qualification, to any intentional touching of an intimate body part of another for a sexual purpose.

For the foregoing reasons, we reject the idea that Roy was exempt from discipline under section 726 unless he was the giver and not merely the recipient of sexually intimate contact with his patient.

We believe this result comports with the Legislature's intent to protect vulnerable patients from overreaching by their physicians. "The patient's physical and mental well-being depends upon the physician's competence. Detailed physical examinations along with the patient's personal revelations and insights often accompany most courses of treatment. Patients' vulnerability compounded with their obvious dependence on the physician to 'cure their ills' places the physician in a position of dominance.[9] It is this position of dominance, or relative disparity of power in the relationship, which has led the American Medical Association . . . to conclude that having sexual relations with a current patient is unethical. [¶] The prohibition against sexual relationships with patients dates back over one thousand years to the Hippocratic Oath." (Note, *"Calling Dr. Love": The Physician-Patient Sexual Relationship as Grounds for Medical Malpractice—Society Pays While the Doctor and Patient Play* (1999–2000) 14 J.L. & Health 321, 324–325, fns. omitted.)

In a letter to the Governor urging his signature on the bill, the author of the 1993 amendment to sections 726 and 729 wrote, "The problems with sexual contact between a physician and patient, whether it is consensual or not, are obvious. First, it exploits the patient's emotional and physical trust. Second, it causes the physician to lose his or her objective judgment, which can lead to inadequate medical care for the patient." (Sen. Daniel E. Boatwright, sponsor of Sen. Bill. No. 743 (1993-1994 Reg. Sess.), letter to Governor Wilson, Sept. 9, 1993.) In its recommendation that the Governor sign the bill, the Department of Consumer Affairs referred to a study indicating 9 percent of physicians were still having sex with their patients and concluded, "Current laws regarding sexual misconduct are not working as a deterrence to exploitation of patients." (Dept. of Consumer Affairs, Enrolled Bill Rep. on Sen. Bill No. 743 (1993–1994 Reg. Sess.) Sept. 17, 1993, p. 2.)

Through section 726, the Legislature decided that the only way to stop physicians from engaging in these unethical practices was to ban *"any act* of sexual abuse, misconduct, or relations" between physician and patient. (§ 726, italics added.) The idea that a physician could, with legal impunity,

---

[9] This observation is particularly true in the case of a female patient of a male gynecologist.

receive sexual favors from a patient as long as he does not return them would, in our view, create a loophole in the statute that the Legislature could neither have imagined nor intended.

## DISPOSITION

The petition for writ of mandate is denied. The stay of proceedings is dissolved and the alternative writ is discharged. Each party shall bear its own costs in this original proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(B).)

Robie, Acting P. J., and Murray, J., concurred.

A petition for a rehearing was denied September 20, 2011, and petitioner's petition for review by the Supreme Court was denied November 22, 2011, S197099.