Filed 8/21/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.E. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.E. et al., Defendants and Respondents; A.E. et al., Appellants. | E070578 (Super.Ct.Nos. J274046, J274047, J274048, J274049, J274050 & J274051) OPINION |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Reversed with directions.

Lori A. Fields, under appointment by the Court of Appeal, for Appellants.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

Emery F. El Habiby, under appointment by the Court of Appeal, for Defendant and Respondent E.E.

1

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Respondent, J.E.

Six children appeal from the juvenile court's dispositional order granting reunification services to their parents. The court found that Welfare and Institutions Code[1] section 361.5, subdivision (b)(5) (section 361.5(b)(5)) and (b)(6) (section 361.5(b)(6)) applied, warranting bypass of reunification services. But the court found that the bypass provisions were overridden under section 361.5, subdivision (c)(2) (section 361.5(c)(2)) and (c)(3) (section 361.5(c)(3)) because reunification was in the best interest of the children, services would likely prevent reabuse, and it would be detrimental not to provide them.

We agree with the children that the findings under section 361.5(c)(2) and section 361.5(c)(3) are not supported by substantial evidence. We accordingly reverse.

Although the only issue on appeal is whether substantial evidence supports the juvenile court's findings, our analysis requires us to address a legal issue that no prior published decision has mentioned. We hold that in section 361.5(c)(3), the term "testimony" refers to in-court oral statements of live witnesses, not to other forms of evidence.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

BACKGROUND

A. *Referral and Detention*

    1. *Events Preceding Detention*

E.E. (Mother) and J.E. (Father) (collectively, Parents) adopted M.E. (male, age 10)[2] and twins D.E.1 and D.E.2 (males, age 8) in 2012 and adopted S.E. (male, age 5), A.E.1 (male, age 4), and A.E.2 (female, age 3) (collectively, the children) in 2017. The three younger children began living with Mother and Father in July 2016, and their adoptions were finalized on November 7, 2017.

On December 6, 2017, San Bernardino County Children and Family Services (CFS) received an immediate response referral alleging physical abuse and general neglect of A.E.1. Shortly after noon that day, Mother had taken A.E.1 to the hospital, where he was diagnosed with multiple head injuries, namely, a right frontal scalp hematoma, a nondisplaced frontal and temporal fracture, a subdural hematoma, and a concussion. Because of the skull fracture, A.E.1 was transferred to a second hospital.

When interviewed at the second hospital by the CFS social worker, Mother said that A.E.1 was running in the hallway at home and fell on his face onto a tile floor. When she approached him, she saw him "'go woozy' and fall once more, face first, [o]nto the tile floor." He was unconscious for about five minutes, woke up, vomited twice, and was then taken to the hospital approximately 30 minutes later, vomiting twice on the way and one more time upon arrival. Mother left the other five children at home

---

**2** These are the children's ages at the time of the detention report on December 12, 2017.

3

alone, awaiting a family friend who would look after them. Mother reported that A.E.1 had speech and developmental delays, visual motor integration issues, and absent seizures. She further reported that he had fallen several times in the past but had not been injured. Mother denied physical abuse and reported disciplining the children by giving them time-outs, sending them to bed early, or taking away privileges.

Father did not have any firsthand knowledge of the incident because he was at work when it happened. He, however, corroborated Mother's account of A.E.1 having "physical limitations" and issues "'with balance'" for which he said A.E.1 was being treated by a physical therapist and an occupational therapist. Father denied that the children were physically abused. He explained that Mother was responsible entirely for disciplining them and that she would do so by having them "'sit on the time-out chair.'"

The CFS social worker attempted to interview A.E.1 at the hospital but was unable to because of his speech delay. The two treating physicians reported that there were no signs of physical abuse, and one of the doctors reported that A.E.1's injuries were consistent with him falling.

After consulting with a CFS supervisor, the same social worker, accompanied by another CFS social worker and two police officers, drove directly from the hospital to the family home to interview the other children, with Parents' permission. It was late at night, and all of the children were sleeping. The social workers and the officers were unable to interview S.E. (who would not wake up) and A.E.2 (who woke up but would not respond to questions). But the social workers and officers interviewed M.E., D.E.1, and D.E.2 separately after they were awakened by Mother's friend (C. Martinez), and

4

each of them gave the same answer when asked what happened to A.E.1: A.E.1 had been "bugging" A.E.2, and Mother told him to stop. A.E.1 did not stop, and Mother then grabbed A.E.1 and threw him against the wall twice. Mother then grabbed him again, threw him to the floor, and pinned him down with her knee. Mother stopped when A.E.1 began to throw up. D.E.2 was afraid because he saw that A.E.1's leg had twisted and thought that A.E.1 "'was really hurt.'"

M.E., D.E.1, and D.E.2 also all said that Mother and Father disciplined them by spanking them on the buttocks with a "spanking spoon" and with their hands. M.E. explained that the children would get into "'big scary trouble'" if they got out of bed during bedtime so he would "hold[] it" if he had to urinate, and the other children would either wear diapers or have accidents in bed. M.E. described "'big scary trouble'" as the children being thrown onto the floor and spanked. M.E. reported that Mother had previously thrown S.E. on the floor after he touched A.E.2's vagina.

Early in the morning the next day, on December 7, 2017, CFS detained the children after securing a warrant. Mother was arrested for a violation of Penal Code section 273a, subdivision (a), willful harm or injury to a child.

1. *Section 300 Petition and Detention*

Based on A.E.1's injuries and the statements made by M.E., D.E.1, and D.E.2, CFS filed a dependency petition as to all of the children, alleging pursuant to subdivisions (a), (b)(1), and (e) of section 300 with respect to A.E.1 that Mother had seriously harmed and injured him, that she perpetrated severe physical abuse against him, and that Father knew or should have known of the abuse by Mother and had failed to

5

protect A.E.1 from her.[3]  For the remaining five children, the petition alleged under subdivision (j) of section 300 that they were at substantial risk of harm as a result of Mother's abuse of their sibling, A.E.1, and Father's failure to protect A.E.1.  At the detention hearing, the court ordered the children detained, allowed Mother and Father to visit the children weekly with professional supervision, and ordered reunification services for both Parents pending development of the case plan.

2.      *Contested Jurisdiction and Disposition Hearing*

At the five-day contested jurisdiction and disposition hearing, the court heard testimony from Mother, L. Heling (an instructional assistant who worked at a preschool that most of the children attended), C. Martinez (the friend of Mother's who watched the children while Mother was at the hospital with A.E.1) and the social worker who authored the detention report.  In addition, the court admitted the jurisdiction and disposition report filed by CFS in January 2018, the two additional information reports (also referred to as 6.7 reports) filed by CFS in February and March 2018, and all of the documents attached to those reports.  The court also admitted a report from Dr. Robert L. Suiter, a clinical and forensic psychologist who evaluated Mother over the course of two sessions in February 2018 to determine her psychological propensity for abusing children.

---

[3]      CFS also alleged under subdivision (b)(1) of section 300 that Mother and Father had a history of failing to protect A.E.1 by not providing him necessary medical treatment.  The parties later stipulated to dismiss those allegations.

1. *Documentary Evidence*

    a. *Interviews of the Children*

A social worker interviewed M.E., D.E.1, D.E.2, and S.E. separately for the jurisdiction/disposition report. The social worker reported that M.E., D.E.1, D.E.2, and S.E. confirmed the statements they made the night A.E.1 was injured. All four described "big scary trouble" as being thrown against the wall and/or onto the ground, sometimes repeatedly in the same incident. Mother would tell them to "'get up'" and then throw them against the wall and/or onto the ground again. According to the oldest three (M.E., D.E.1, and D.E.2), S.E. and A.E.1 were punished the most with "big scary trouble" because they behaved the worst. All four "stated that [A.E.2] does not get thrown against the wall or thrown onto the ground by [M]other and [F]ather." S.E. said that Father also had been physically abusive toward him and the other boys but with less frequency than Mother.

M.E., D.E.1, and D.E.2 stated that on the day A.E.1 was taken to the hospital he got into "big scary trouble" and that they saw Mother throw him against the wall and then onto the floor. D.E.1 and D.E.2 said that Mother told the other children to stay away but that they did not listen to her and saw what happened to A.E.1. In addition, all four children described the "secret spanking spoon" as a wooden spoon that was stored in the kitchen and that both Mother and Father had used to spank them on the buttocks. All four stated that Mother had told them that she had "since thrown the spoon away because she was told that she cannot use it to spank them." S.E. was the only one who expressed that he was afraid of Mother and Father.

7

Two weeks later, on January 16-18, 2018, forensic interviews of all of the children were conducted by Children's Assessment Center (CAC). In his forensic interview, M.E. provided further details about the incident, explaining that A.E.1 had gotten into "'[b]ig, big, big, giant, scary trouble'" and then vomited "'yellow'" onto the carpet, which he described as "'almost like [A.E.1] had pee coming out of his mouth.'" He said A.E.1 threw up anytime he got into trouble "'that big.'" The Parents disciplined the children by throwing them against the wall, by throwing them onto the floor, or by sending them to time-out. "'Big, big, big, scary trouble'" happened when either Mother or Father would throw a child against a wall or onto the floor. Both Parents participated in "'[b]ig [s]cary [t]rouble'" on "multiple occasions," which resuled in the children "'get[ting] hurt.'" M.E. verbally expressed and demonstrated that when the children were thrown to the floor Parents would pick them up "'high and then drop us.'" A.E.1, D.E.1, A.E.2, and M.E. all had gotten into "[b]ig [s]cary [t]rouble."

M.E., who turned 10 years old several months before the interview in September 2017, explained that the last time he was in "'[b]ig [s]cary [t]rouble'" was when he was nine years old. M.E.'s brothers were tickling him, so Mother threw M.E. onto the "'hard'" tile floor and then immediately threw him against the back of the couch. Mother did not allow the children to tickle each other because Mother had been hurt once from being tickled. As a result of being thrown that day, M.E.'s hip, head, and back hurt. Mother apologized to M.E. because she heard him "'crying for a long time.'" M.E.'s body shook when he was in "[b]ig [s]cary [t]rouble," and he would feel scared.

8

D.E.2 reiterated to the forensic interviewer what he had said in previous interviews and described witnessing Mother screaming at A.E.1, throwing A.E.1 against the wall, and then throwing A.E.1 onto the ground because Mother wanted to know what A.E.1 was doing. When A.E.1 attempted to respond, Mother was unable to hear the response because she was holding his throat against the wall. When Mother "'made [A.E.1] break his leg,'" A.E.1 stopped responding. After A.E.1 was thrown, he was unable to walk, threw up, had a "'flat stomach,'" and "'was leaking blood out of his mouth.'" Mother told D.E.2 to tell everyone that he did not see her hurt A.E.1 and that he should say that "'[they] were jumping on the trampoline.'" D.E.2 did not think that his siblings had seen what happened to A.E.1 but thought they could hear Mother screaming from their vantage point of sitting on the couch. D.E.2 said that Mother also had thrown S.E. previously.

In contrast to the interview with the social worker for the jurisdiction/disposition report, S.E. did not cooperate with the forensic interviewer and repeatedly asked for the interview to be terminated. S.E. did not know what happened to A.E.1 but also said, "'He didn't get hurt … I can't tell you. Once he gets back I'll tell you.'" S.E. thought that A.E.1 might never return home if S.E. said anything.

In contrast to S.E., D.E.1 was very talkative and engaged in the forensic interview. He explained that he always told the truth unless he was told to lie by Mother, such as when she told him to lie and say that he was on the trampoline when A.E.1 was injured. D.E.1 had only been in "[b]ig [s]cary [t]rouble" once and did not want to talk about it because it was too scary.

9

D.E.1 described what happened to A.E.1 as follows:  Mother picked A.E.1 up "high in the air," A.E.1 was screaming, crying, and bleeding, and Mother threw A.E.1 onto the ground on top of a toy, which caused A.E.1's leg to be injured and prevented him from getting up.  Mother then hit A.E.1 "everywhere," and Mother placed her whole body on top of A.E.1's.  Afterward, A.E.1 was lying on the carpet and "throwing up 'everywhere … Pedia-sure, banana, string cheese and milk.'"  A.E.1 was bleeding because Mother dug her nails into his armpits, and he had blood all over his clothes, including his shirt, socks, pants, and underwear.  D.E.1 screamed while watching because he was "so scared."  Mother told D.E.1 to go away, but he ducked down so he could "'spy'" on Mother.

As to Father, D.E.1 explained that Father was "always 'mean to us'" and that when the children would get into trouble Father would yell, use time-outs, spank the children on the butt, and "do[] 'Big Scary Trouble.'"  Father used the "'[s]panken [s]poon'" to spank D.E.1 on his bare butt, which D.E.1 described as "really hurt[ing]" and causing his butt to burn, to turn red, and to "feel[] really hot."  The "[s]panken [s]poon" was a wooden spoon from the kitchen.

A.E.2, who had not been interviewed previously, told the forensic interviewer that on the day of the incident A.E.1 was screaming outside, and Mother had to "take [A.E.1] to the doctors."  A.E.1 "'goes into time out'" when he gets into trouble.  A.E.2 started to discuss someone getting "'beat up'" but did not further elaborate.

10

A.E.1 told the forensic interviewer, "'Mommy hit me,'" and he then pointed to his head. When asked to provide additional details, A.E.1 refused and repeatedly stated, "'I don't want to tell you.'" He also said that Mother had hit A.E.2 on the head.

Responding to a later allegation of abuse arising from the group home at which A.E.1 was placed, on February 21, 2018, a social worker interviewed A.E.1 about those allegations, which he denied. During the interview, he spontaneously disclosed that Mother had "hurt his head when she 'threw me against the wall,'" which he said happened twice on the day he was taken to the hospital. He expressed being afraid of his Parents when they got upset with him or when he was in trouble. A.E.1 said that Mother had also thrown S.E. against the wall but denied seeing it happen with the other children.

The social worker noted that A.E.1 appeared to have a steady gait and good balance. Neither the social worker nor an administrator at the group home had observed A.E.1 suffering from any kind of "falling disorder." Neither had seen A.E.1 fall down in the manner described by Parents. The social worker saw A.E.1 stand on his head.

b. *Police Report*

The police report presented additional information that had been gathered when the three oldest boys, Father, Mother, and C. Martinez were interviewed on the night of the incident. The report recounted the boys' description of the day A.E.1 was injured, including their description of where they were located when the incident occurred and the vantage point of their observation. Although Father told the officer that neither he nor Mother physically punished the children, Father indicated that he had "seen [Mother] get

11

overwhelmed with the children and sometimes yell[] at them." Father said A.E.1 fell two to three times per day.

C. Martinez stated that when she arrived at the house to watch the children while A.E.1 was at the hospital, M.E. told her that A.E.1 had gotten into trouble and that Mother had been mad at A.E.1. C. Martinez reported that she had seen Mother spank one of the children with an open hand on their buttocks before and also had seen Mother get overwhelmed and yell at the children.

Mother told the officer that A.E.1 fell while running down the hall toward the playroom, tripped, fell on his face on the tile floor in the entryway, stood up, threw up, fell again, and then became unconscious. She said that A.E.1 fell approximately 25 times a day. She said that the term "big scary trouble" referred to "a time out in the rocking chair or early bed time." The "spanking spoon" referred to a spoon in the kitchen that Mother and Father only threatened to use on the children.

c. *Forensic Medical Examinations*

The CAC also conducted forensic medical examinations of A.E.1, S.E., and A.E.2. For A.E.1, the forensic examiner found that the injury A.E.1 sustained the day he was taken to the hospital, "a [right] frontal [and] anterior temporal fracture with small associated subdural hematoma," was consistent with physical abuse and opined that the "[i]nitial story provided by [M]other that [A.E.1] fell from his own height while running does not explain the injury." The report also documented various other bruises, scars, and lesions on A.E.1's body. The examiner recommended protective custody.

12

For S.E., the forensic medical examiner found "bruising that [was] concerning to bilateral flanks and forehead." Additional "scattered" bruising was found on S.E.'s shins, and a scar was found on his upper inner arm. The examiner concluded that the injuries were "suspicious for physical abuse" and recommended protective custody but noted that "more history [was] needed."

The forensic medical examination of A.E.2 revealed "non-specific injuries on … various locations of her body," including "bruising on her chest and legs, scarring on her arms and legs, and abrasions on her face, left arm and left leg." A.E.2 could not explain the injuries. The examiner found that the injuries could have been "caused by abusive or accidental mechanisms" and concluded that there were not "any findings specific for physical abuse." However, "[t]he absence of physical findings on [A.E.2] [did] not negate the provided history which is suspicious for physical abuse."

d. *Other Medical Records*

Medical records from the two hospitals at which A.E.1 was treated on December 6, 2017, documented the injuries A.E.1 sustained, the tests conducted, and the treatment A.E.1 received. A resident who treated him at one of the hospitals reported that "[t]here is no suspicion of child abuse in this case."

Skeletal surveys were conducted of both A.E.2 and A.E.1 on December 28, 2017. For A.E.2, "[n]o acute, healing, or healed fracture[s] [were] detected." For A.E.1, the skeletal survey was "concerning for anterior wedge compression deformities involving the T5-T8 vertebral bodies, concerning for compression fractures and an irregularity along the inferior sternum which may be artifactual." A repeat skeletal survey was

13

conducted on A.E.1 in early March 2018, and "[t]he vertebral and sternal findings previously questioned were not seen on further imaging and d[id] not represent healing traumatic findings."  The CAC doctor who summarized these findings opined that "[i]n totality, [A.E.1]'s head trauma, bruising and history provided by siblings is consistent with physical abuse."

e.  *Interviews with Parents and Progress Reports from Therapists*

*Mother*

In an interview with a social worker on December 21, 2017, Mother "adamantly denied the allegations and stated that she would never do anything to cause harm to any of her children."  Mother denied using corporal punishment to discipline the children and explained that the disciplinary methods she employed instead included requiring the children to go to bed early, requiring them to do a "'time in' or 'time out,'" or taking away a privilege from them.  She had no explanation for why any of the children would allege that she had physically abused them.  She noted that there were no less than 18 service providers in her home weekly, so there was "no way that she and/or [Father] could have been abusing the children without it going unnoticed and unreported."  She also expressed that she loved and missed the children very much and hoped to reunify with them.

In a progress report dated February 4, 2018, Mother's therapist reported that Mother continued to "maintain[] innocence of abuse but acknowledge[d] she should have waited for her friend to arrive at the home, to care for the other children, prior to leaving for the hospital with the injured child."  Mother had actively participated in individual

14

therapy sessions and parenting classes and was willing to participate in any services needed to reunify with the children and was "able to identify acts of protection for the well[-]being and safety of her children." Additional individual therapy sessions were recommended.

### *Father*

In an interview with a social worker on January 10, 2018, Father also denied the allegations, denied that corporal punishment was ever used by him or Mother, and "stated that [Mother] would never cause harm to any of their children." He corroborated the disciplinary techniques that Mother said that they used and denied that the "'secret spanking spoon'" was ever used for disciplinary purposes. The spoon was "something they would joke about with the children." He too said that he and Mother love the children very much and were sad that they were not together.

In a progress report dated February 8, 2018, Father's therapist reported that Father had actively participated in both his individual therapy sessions and parenting class sessions, with a notable increase in participation during the more recent individual sessions. Father denied abusing or neglecting the children himself but expressed concern about whether Mother may have abused them and whether he had thus failed to protect them from her. The therapist recommended additional individual therapy sessions and parenting classes, opining that Father would need to "feel more comfortable in therapy before being open to challenging and processing his thoughts and understanding about his case."

15

f. *Report from Dr. Suiter*

Dr. Suiter evaluated Mother to determine whether she had a psychological propensity for abusing children. He reported that Mother "strongly" denied ever physically disciplining the children and said that A.E.1 had a "'bad fall and passed out'" on the day that he was taken to the hospital. To discipline the children, Mother explained that she used time-in techniques, talked to them about their behavior, and talked to them about the natural consequences of their behavior. A multitude of tests were performed to determine Mother's "underlying personality dynamics as well as to identify any underlying psychopathology." The results of the tests indicated that Mother was "likely to be emotionally well-adjusted and psychologically robust" and did not indicate that she had "a propensity to abuse children or to be unduly rigid in terms of parenting." Dr. Suiter emphasized that "the results of this evaluation [were] quite inconsistent with [Mother] physically abusing a child." The assessment, however, was limited to analyzing whether an individual had "traits and characteristics that would predispose them with a specific behavior and/or demonstrate if their traits and characteristics were consistent with having committed a certain behavior," and it could not "determine whether or not someone has engaged in a particular behavior or will of a certainty engage in such a behavior."

g. *Letters*

Mother and Father submitted 37 character reference letters to CFS.[4] The letters

were attached to the jurisdiction/disposition report and were from friends, neighbors,

fellow church congregants, pastors from Mother's and Father's church, former students

of Mother's from classes she taught at church, other parents who belonged to the same

homeschooling program, and various teachers and tutors of the children, as well as an

employee from their preschool, a speech therapist, and a mail carrier. The overall

consensus was that Parents were involved, devoted, and loving parents, the children

appeared happy, the children loved and adored Parents, Parents disciplined the children

appropriately, and the children did not exhibit any signs or symptoms of abuse.

The licensed marriage and family therapist who taught Mother's parenting classes

reported that Mother had completed the 12-week course, actively participated, shared

about her experiences as a parent, acknowledged "needing growth" as a parent, and

"presented as having increased her knowledge about effective parenting."

2. *Testimony*

a. *Mother*

At the outset of her testimony, Mother described the number of placements in

which the children had previously resided before Mother and Father adopted them (14 for

D.E.1 and D.E.2 over 18 months, nine for M.E. over the same period, and several for the

youngest three), their previous histories with physical and sexual abuse, the services they

---

**4**   We have counted one of the letters twice because it was signed by two people (a married couple).

required every week to attend to their developmental, emotional, and physical needs, and the number of service providers (approximately 15) who were in Parent's home weekly for the children. Mother insisted that A.E.1 had injured himself by falling while he was running toward her in the hallway to put his shoes on for school. A.E.1 fell to the side 20 feet away from her, she started walking toward him, he got up, and then he fell again before she reached him. Mother thought that A.E.1 had an absent seizure, which he was prone to do. A.E.1 had hit his head and was unconscious by the time Mother reached him. He awoke in her arms approximately three minutes later and then threw up. He threw up twice at home and once at the hospital. A.E.2 was the only child who may have seen what happened because A.E.2 was sitting on the couch. The boys were outside playing on the trampoline. As a result of her concern for A.E.1, Mother panicked and left the rest of the children in the house alone while she took A.E.1 to the hospital. She called C. Martinez, a family friend, to take care of them.

A.E.1 was unsteady on his feet and bumped into things or fell on a regular basis. But he had never suffered such a serious injury to the head from falling, though Mother had heard he fractured a rib at a previous placement.

Mother denied ever hitting the children or spanking the children with a spoon or anything else and said that she and Father disciplined the children by taking away a privilege or by giving a time-out or a time-in. Several months before the incident Mother had seen a meme on Facebook depicting a spoon and a jail cell with a caption that read "something to the effect of, if more parents used this, we would, referring to the spoon, then we would need less of this, referring to the jail cell." M.E. saw it too and asked

Mother about it, and she explained to him that "some people think it's okay to hit their kids with a spoon as far as correction," "but it's not appropriate for our family." M.E. began talking to his siblings about what he learned about other parents who discipline their children using spoons, and the children brought up the topic a couple of times thereafter.

Mother thought one of the superhero movies the children had watched with her had a "big scary monster" in it. The children did not discuss the monster after seeing the movie.

b. *C. Martinez*

C. Martinez was a friend of Mother's who had assisted Mother with the children at home three days per week over the previous one and one-half years. She never saw Mother or Father physically abuse any of the children, nor did she notice any visible injuries on them. She estimated that there were at least 10 providers in the home weekly to help with schooling or training for the children. C. Martinez watched the children alone at times, and the children never complained about being abused. The children have vivid imaginations. A.E.1 had balance problems and would sometimes "just fall over" when walking or would walk into objects like walls or chairs. When A.E.1 fell, she saw him fall to the side or forward. When he fell forward, he braced himself with his hands. C. Martinez never saw A.E.1 fall and hit his head.

On the day of the incident, when C. Martinez arrived to take care of the children, M.E. told her that Mother took A.E.1 to the hospital because A.E.1 got sick. The children did not appear upset or distressed.

19

c. *L. Heling*

Heling, an instructional assistant at a preschool that all of the children but M.E. had attended, was familiar with all of the children because she helped Mother out at home one day per week with tutoring and home schooling. D.E.1, D.E.2, S.E., and A.E.1 all had problems separating fact from fiction, so they would tell stories about things that they had seen on television or read in a book and think those things had actually happened. S.E. would mistake movies for dreams he had. Heling occasionally showed the children movies and recalled "big scary trouble" occurring in a Power Ranger movie.

A.E.1 was "quite clumsy" and the most likely to fall of the children. A.E.1 fell a lot in the playground, but Heling never saw him fall and hit his head or significantly injure himself.

A.E.2 continued attending the preschool for some time after she was detained and would tell Heling every day that she missed Mother and that Father loved her. Heling thought the children adored Parents and had a "[v]ery loving" relationship with them.

d. *Social Worker*

Mayra Bernal, the social worker who responded to the immediate response referral and authored the detention report, was called to the stand by Mother. She described her investigation and initial interviews at the hospital and with the children at their home. Bernal felt M.E., D.E.1, and D.E.2 were honest during their initial interviews. She had interviewed hundreds of children and sometimes felt the children she interviewed were not telling the truth. The detention warrant was secured based on the injuries sustained

by A.E.1 and the statements made by M.E., D.E.1, and D.E.2. Bernal believed that A.E.1 had suffered abuse in the home.

### 3. *CFS Recommendation*

In its assessment and evaluation, CFS opined that the case had a "very guarded" prognosis. CFS noted that the disclosures made by the children who were interviewed remained consistent and that Parents continued to deny any wrongdoing. CFS had serious concerns about the overall safety and well-being of the children with both Parents but especially Mother. CFS recommended that it was not in the children's best interest to offer reunification services for Mother and that Father would "need to complete intensive individual counseling and parenting classes in an effort to accept and come to terms with the disclosures of physical abuse that were made by the children and also in an effort to gain the ability to be protective of the children." CFS further opined that Father would need to show that he truly benefitted from the services, not merely that he completed them.

### 4. *Jurisdiction and Disposition Findings and Orders*

At the end of the hearing, the court granted the children's request to amend the original petition to conform to proof. Specifically, with respect to A.E.1, the court added an allegation against Father under section 300, subdivision (e) (severe physical abuse of a child under five years old), that he knew or reasonably should have known of the abuse by Mother but failed to intervene and allowed Mother unsupervised access to A.E.1, thereby placing A.E.1 "at substantial risk of serious physical harm and/or future abuse." With respect to M.E., D.E.1, D.E.2, S.E., and A.E.2, the court added an allegation under

21

section 300, subdivision (a) (serious physical harm inflicted nonaccidentally), alleging that the boys other than A.E.1 suffered severe physical abuse by both Mother and Father, namely, being hit with a wooden spoon and thrown against the wall on numerous occasions.[5]

As to A.E.1, the court then found true the jurisdictional allegations under subdivisions (a) and (e) of section 300 as to Mother, and subdivisions (b)(1) and (e) as to Father. The court found that the allegations under subdivision (e) of section 300 were supported by clear and convincing evidence. With respect to the remaining children, the court found true the jurisdictional allegations under subdivisions (a) and (j) of section 300.

The court found that the reunification bypass provision of section 361.5(b)(5) applied as to A.E.1 and that section 361.5(b)(6) applied as to the other children. The court then found that reunification was nonetheless in the best interest of the children and ordered CFS to provide reunification services to Mother and Father under section 361.5(c)(3) as to A.E.1 and section 361.5(c)(2) as to the other children.

The court explained that "all of the children, but [A.E.1], specifically, initially, have been to many homes before they came and—came with the [Parents]. [¶] They finally have a family. They have a [M]other and a [F]ather who [are] committed to them to have a family. And recognizing that all the children are special needs, these [P]arents

---

[5]     We note that the court added the allegation under subdivision (a) of section 300 as to A.E.2 on the court's own motion. The children requested that it be added as to M.E., D.E.1, D.E.2, and S.E. only.

have concluded that they want to be able to nurture and develop these children. There's also no prior CFS history. [¶] And so the Court is going to find that the frustration the [M]other and the [F]ather at times with respect to losing patience and using the wooden spoon, throwing against the wall, are things that services would likely prevent re-abuse." The court acknowledged that the challenge for Parents would be "understanding and acceptance of responsibility for what happened" but "conclude[d] that it is likely that the children can be safely returned within 12 months."

## DISCUSSION[6]

The children contend that the juvenile court abused its discretion by ordering reunification services for both Mother and Father under section 361.5(b)(5) and section 361.5(b)(6) because the record does not contain substantial evidence supporting the court's findings that reunification would be in the children's best interest, that services would likely prevent the reabuse of A.E.1, and that A.E.1 was closely and positively attached to Mother. We agree with the children and conclude that those findings are not supported. The juvenile court therefore abused its discretion by ordering reunification services for both Mother and Father.

---

[6] At the request of Father, we take judicial notice of the minute order from the October 5, 2018, six-month review hearing under section 366.21, subdivision (e). (Evid. Code, § 452, subd. (e).) Father contends that the order renders the appeal moot because the reunification services ordered at disposition have been completed and new reunification services have been ordered. We reject Father's contention and conclude that the order for continued reunification services does not render the appeal moot. Our reversal of the dispositional order will provide effective relief by terminating reunification services for both Parents. (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.)

1. *Standard of Review*

"'A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion.'" (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164-1165, quoting *In re William B.* (2008) 163 Cal.App.4th 1220, 1229.) If the juvenile court's finding that further services would be in the children's best interest is not supported by substantial evidence, then the order for such services constitutes an abuse of discretion. (*In re William B.*, *supra*, at p. 1229; *In re S.B.* (2013) 222 Cal.App.4th 612, 623; *In re Ethan N.* (2004) 122 Cal.App.4th 55, 65.)

2. *Reunification Bypass Under Section 361.5(b)(6) as to M.E., D.E.1, D.E.2, S.E., and A.E.2*

Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 (*Baby Boy H.*); § 361.5, subd. (a).) The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that "[r]eunification services need not be provided" if the court finds "by clear and convincing evidence" that any of 17 enumerated bypass provisions apply. (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.) Subdivision (c) of section 361.5 adds with respect to nearly all of the bypass provisions that, if a bypass provision applies, then the court "shall not order" reunification services unless the court makes certain countervailing factual findings. (§ 361.5(c)(2) [denial of reunification services is

24

mandatory, subject to override, for parents described by § 361.5 subd. (b)(3)-(4) & (6)-(17)], § 361.5(c)(3) [denial of reunification services is mandatory, subject to override, for parents described by § 361.5(b)(5)].) In sum, section 361.5, subdivision (a), provides that reunification services are mandatory unless a bypass provision applies; section 361.5, subdivision (b), lists the bypass provisions and provides that reunification services are discretionary if any of them apply; but section 361.5, subdivision (c), provides that *denial* of reunification services is *mandatory*, not discretionary, with respect to nearly all of the bypass provisions, unless the court makes certain countervailing factual findings.

The bypass provision at issue with respect to all of the children except A.E.1 is section 361.5(b)(6), which applies if (1) "the child has been adjudicated a dependent … as a result of … severe physical harm to the child, a sibling, or a half sibling by a parent or guardian," and (2) "the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).) If that bypass provision applies, then the court "shall not order" reunification services "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5(c)(2).)

Here, the trial court found by clear and convincing evidence that section 361.5(b)(6) applied, but the court also found by clear and convincing evidence that it was

25

overridden under section 361.5(c)(2). The children argue that the court's findings under section 361.5(c)(2) are not supported by substantial evidence, and we agree.[7]

The record contains no evidence to support the trial court's finding that reunification would be in the best interest of M.E., D.E.1, D.E.2, S.E., and A.E.2. Although there was evidence that both Mother and Father were actively engaged in services, there was no prospect of any substantive progress in addressing the issues that led to the children's removal, because both Mother and Father continued to deny that they had ever abused the children or had even physically disciplined them.[8] Rather, Mother continued to insist that A.E.1's injuries were caused by an accidental fall, despite the overwhelming evidence to the contrary. The forensic medical examiner concluded that the injuries A.E.1 sustained could not have been caused by his falling in the manner described by Mother. And the children (except the youngest, A.E.2) consistently

---

[7] We note that the court's finding under section 361.5(b)(6)(A) that "it would not benefit the child[ren] to pursue reunification services" appears to contradict the court's finding under section 361.5(c)(2) that "reunification is in the best interest of the child[ren]." Were we to determine that both of those findings are supported by substantial evidence *and* that they are irreconcilably contradictory, we would have to remand the matter for further fact finding by the trial court. (*Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service, Inc.* (1932) 217 Cal. 131, 137 [when the trial court's findings are "contradictory and irreconcilable," but each of them "finds support in the record," the matter must be remanded for further fact finding].) Because the finding under section 361.5(c)(2) is not supported by substantial evidence, however, no such remand is necessary. We accordingly need not and do not decide whether the findings are irreconcilably contradictory.

[8] We assume the correctness of the trial court's findings that the allegations of the petition, amended to conform to proof, are true. Those findings are not challenged by any party, they are supported by overwhelming evidence (though there is also conflicting evidence, namely, Parents' denials), and they do not conflict with any of the court's other findings.

26

recounted that Mother had caused A.E.1's injuries and that both Mother and Father had repeatedly used inappropriate physical discipline.

Mother counters that we cannot infer anything from her persistent denials of any wrongdoing because she was merely exercising her Fifth Amendment privilege against self-incrimination while a criminal investigation was pending. The Fifth Amendment, however, is not implicated here because Mother chose to testify. While the Fifth Amendment protected Mother from being compelled to testify, "the Fifth Amendment privilege does not condone perjury" once an individual chooses to testify. (*United States v. Wong* (1977) 431 U.S. 174, 178.) Mother cites no authority for the proposition that the Fifth Amendment prohibits the juvenile court (or this court) from relying, to Mother's detriment, on Mother's voluntary testimony in this case, and we are aware of none. Moreover, testimony in juvenile proceedings (and anything said to a therapist in connection with those proceedings) is not "admissible as evidence in any other action or proceeding." (§ 355.1, subd. (f); *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1142 ["California law offers a promise to a parent that his or her testimony in juvenile dependency proceedings, as well as his or her statements made in therapy in furtherance of the reunification process, will not be used against the parent in a subsequent criminal prosecution."].) Thus, contrary to the assumption underlying Mother's argument, she could have testified honestly in this dependency proceeding and not suffered adverse consequences in a future criminal proceeding. Mother made the choice to testify and deny all responsibility for the severe abuse of A.E.1, as well as her and Father's physical abuse of the other children, and the Fifth Amendment does not prohibit us from relying

27

on those denials in determining whether the record contains substantial evidence that reunification would be in the children's best interest.

Mother further contends that her participation in both parenting classes and individual therapy demonstrates that she "was more than able to reform her parenting style and disciplinary techniques, learn from services, and successfully reunify with the children." That contention is not supported by the evidence. The evidence demonstrates that Mother attended the prescribed individual therapy sessions and parenting classes, but it does not support a finding that she meaningfully participated in those services. Under the circumstances of this case, meaningful participation would require some recognition or acknowledgement of the abusive behavior. Mother's therapist reported that Mother had progressed by being "able to identify acts of protection for the well[-]being and safety of her children," and the forensic psychologist noted that "[h]er responses on a subjective parenting measure were quite adequate in describing how to appropriately address the situations presented her in an adaptive manner." Rather than tending to prove that Mother would be able to reform and that services likely would be successful, the reports from the therapist and the psychologist demonstrate merely that Mother was capable of identifying appropriate disciplinary techniques. That evidence has no tendency to show that reunification services are likely to succeed, however, because Mother's interview with the social worker and the police on the night of the incident showed that Mother was already aware of (and claimed to rely exclusively upon) appropriate disciplinary techniques, such as time-ins or time-outs, taking away privileges, and sending the children to bed early. Despite Mother's demonstrated awareness of such

28

techniques from the inception of the investigation, the trial court found on the basis of overwhelming evidence that Mother in fact employed inappropriate disciplinary methods, repeatedly subjecting the children to severe physical abuse. Mother's attendance at counseling sessions and ability to describe appropriate disciplinary techniques in those settings thus have no tendency to show that her actual parenting practices are likely to improve.

For similar reasons, the record also does not contain substantial evidence that reunification services for Father would be in the children's best interest. Like Mother, Father has consistently denied abusing the children. Though he did not testify, he too never admitted to abusing them himself. He denied responsibility for ever disciplining the children himself at all. While he began to express concern in therapy that Mother may have abused the children and that he may have failed to protect the children from her, he did not take any responsibility for his own abusive actions and never admitted that Mother had actually abused the children. Yet M.E., D.E.1, D.E.2, and S.E. all stated, and the trial court specifically found, that Father had perpetrated the same abuse as Mother—spanking them with the spoon and his hands and throwing them against the wall and onto the floor. A.E.1 said that he was afraid of both Parents when he was in trouble. Given Father's own severe physical abuse of the children and his blanket denials, there was no

29

evidence that Father would benefit from services or that services were likely to prevent reabuse, so there was no evidence that services would be in the children's best interest.[9]

CFS and Father argue, as an alternative basis to affirm the order for reunification services for Father, that the section 361.5(b)(6), bypass provision does not apply to Father because, according to them, the only allegations found true as to Father were based on his failure to protect the children from abuse perpetrated by Mother. The argument fails because it is based on a false premise. All of the allegations against Father in the original petition were based on his failure to protect, but the court amended the petition to conform to proof and sustained an amended allegation under subdivision (a) of section 300 that *both Father and Mother* perpetrated severe physical abuse against M.E., S.E., D.E.1, and D.E.2. That allegation is not based solely on Father's failure to protect. In relevant part, it reads: "This physical abuse by the parents against the children place[s] the children at significant risk of physical harm." In announcing its ruling, the trial court expressly referred to Father's physical abuse of the children: "[T]hat there was either implied consent by the [F]ather with respect to what was going on by [Mother] and what she was doing by way of the physical abuse when she would get frustrated with the

---

**9**      We do not mean to suggest that in every bypass case, a parent's failure to take responsibility for the alleged abuse or neglect will always, as a matter of law, prohibit the court from making the countervailing factual findings necessary to override bypass. Rather, in conducting substantial evidence review, we consider the entire record, which here includes parents' denials. Those denials are relevant on their own and also affect interpretation of the other relevant evidence. We reverse not because parents' denials are inconsistent with the trial court's findings as a matter of law but because the record, considered as a whole, does not contain substantial evidence to support those findings.

30

children, *and that the children have identified that the [F]ather, also, did that at times, again, throwing against the wall and using the wooden spoon.* So the [F]ather knew that the children were being abused by the [M]other, *as well as his own acts* and omissions." (Italics added.) We therefore reject CFS's and Father's contention and conclude that substantial evidence supports the trial court's finding that section 361.5(b)(6) applies to Father, as he too was found to have perpetrated "severe physical abuse" against the four oldest children.

In sum, the record contains no evidence that reunification services could lead to adequate protection of the children and hence no evidence that reunification services would be in the children's best interest, given Father's and Mother's ongoing insistence that all of the physical abuse allegations were false. The record contains no evidence to suggest that reunification services would be effective in modifying Parents' behavior in the future. The court's finding to the contrary was wholly speculative. "A judgment is not supported by substantial evidence if it is based solely upon unreasonable inferences, speculation or conjecture." (*In re H.B.* (2008) 161 Cal.App.4th 115, 120.) Considered in light of Parents' blanket denials, the record presents no reason to believe that further services would prevent Mother or Father from carrying out the same physical abuse and inflicting similar or worse injuries in the future. (See *In re A.M.* (2013) 217 Cal.App.4th 1067, 1077-1078 [finding no evidentiary basis supporting reunification services under section 361.5(b)(5) and section 361.5(b)(6) where the parent was unwilling to acknowledge abuse in the first place].)

We therefore conclude that the record does not contain substantial evidence to support the juvenile court's order granting reunification services to Mother and Father as to M.E., D.E.1, D.E.2, S.E., and A.E.2 under section 361.5(c)(2).

3. *Reunification Bypass Under Section 361.5(b)(5) as to A.E.1*

To deny a parent reunification services under section 361.5(b)(5), the juvenile court must have taken jurisdiction over the child under section 300, subdivision (e), finding that the child was under five years old and suffered severe physical abuse because of the conduct of the parent or guardian. "Pursuant to section 361.5(c)[(3)], if a juvenile court finds the [section 361.5(b)(5)] circumstances to be supported by clear and convincing evidence, the juvenile court is *prohibited* from granting reunification services 'unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent.'" (*In re A.M.*, *supra*, 217 Cal.App.4th at pp. 1074-1075, quoting § 361.5(c)(3).)

The trial court made the necessary findings under section 361.5(c)(3) and on that basis ordered reunification services for both Parents as to A.E.1. The children argue that the court's findings under section 361.5(c)(3) are not supported by substantial evidence. We agree.

Section 361.5(c)(3) requires that the necessary findings be "based on competent testimony." The term "testimony" refers to in-court oral statements of a live witness. (*In re Jessica B.* (1989) 207 Cal.App.3d 504, 518.) "Testimony" thus is not synonymous with "evidence." Rather, testimony is a specific type of evidence. (Evid. Code, § 140

32

['"Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact."].)

If there is no ambiguity in the statutory language, then """"we presume the Legislature meant what it said and the plain meaning of the statute governs.""""  (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394.)  Moreover, "[w]hen different terms are used in parts of the same statutory scheme, they are presumed to have different meanings."  (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130; *Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1343.)  Subdivision (c)(1) of section 361.5 refers to "competent evidence from mental health professionals."  Subdivision (c)(4) of section 361.5, in contrast, refers to "testimony by a competent professional."  Given the Legislature's use of different words—"evidence" and "testimony"—in different parts of the statute, and given the plain meanings of the terms "evidence" and "testimony," we must presume that the Legislature meant what it said in section 361.5(c)(3):  The necessary findings for an order for reunification services under section 361.5(c)(3) must be based on "competent testimony," that is, in-court oral statements of a live witness.

Here, the court found that reunification services as to A.E.1 were warranted under both prongs of section 361.5(c)(3).  For Mother, the court found that "failure to try reunification would be detrimental to [A.E.1] because he's positively and closely attached to the mother."  With respect to both Mother and Father, the court found that "services would likely prevent re-abuse."

The record contains no competent testimony to support those findings.  The respondent's briefs filed by Mother, Father, and CFS do not cite any testimony that

33

supports the court's findings under section 361.5(c)(3). In the relevant sections of those briefs, the only citation to any testimony at all is Father's citation to pages 89-90 of the reporter's transcript, which contains some background testimony by Mother concerning how and when the children came to be in her care, how many previous placements the children had, and so forth. That testimony has no tendency to prove either that services are likely to prevent reabuse or that A.E.1 is so closely and positively attached to Mother or Father that failure to try reunification would be detrimental.

In addition, having read the entire reporter's transcript, we have independently determined that it does not contain competent testimony to support the trial court's findings under section 361.5(c)(3). The only line of testimony that arguably lends some support to the court's findings comes from the instructional assistant at the children's preschool, who testified that she thought the children "adore their parents." Considered in light of the entire record, that single statement does not constitute substantial evidence that A.E.1 is so closely and positively attached to Mother or Father that failure to try reunification would be detrimental to him. Children often adore various adults with whom they have frequent contact, including preschool teachers and babysitters, but those individuals enter and exit the children's lives without causing the children to suffer detriment. Viewed in the context of all of the evidence in this case—including the relatively brief time that A.E.1 spent in Parents' care and the evidence of his fear of Parents as a result of the severe physical abuse he suffered at their hands—the single, unexplored statement that the children "adore their parents" cannot constitute substantial

evidence that failure to try reunification would be detrimental to A.E.1 because of a close and positive attachment between him and Parents.

Moreover, for the reasons discussed in Part 2, *ante*, the record contains no evidence, let alone testimony, that services would likely prevent reabuse, because both Mother and Father continue to be in complete denial about the existence of the abuse. (*In re A.M.*, *supra*, 217 Cal.App.4th at p. 1077 ["there are no services that will prevent reabuse by a parent who refuses to acknowledge the abuse in the first place"]; *In re Madison S.* (2017) 15 Cal.App.5th 308, 327 [finding no evidence that services likely would prevent reabuse where the father denied abusing the child and "neither parent was even willing to acknowledge that nonaccidental injury occurred"].)

Finally, Mother argues that "[t]o the extent the record is silent as to the nature of [A.E.1's] bond with [Mother], this was due to [CFS's] failure to satisfy its own obligation under section 361.5[(c)(3)], to investigate whether reunification services were likely to be successful." We disagree. Although section 361.5(c)(3) does require the social worker to "investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child," Mother and Father still bore the burden of proving, through competent testimony, the factual predicates to an order for reunification services under section 361.5(c)(3). (*In re Madison S.*, *supra*, 15 Cal.App.5th at p. 327.) Parents did not introduce any such testimony, the record contains none, and section 361.5(c)(3)'s requirement that CFS investigate and advise the court did not further require CFS to call witnesses to testify

35

against CFS's own recommendation. Thus, assuming for the sake of argument that CFS failed to discharge its obligation to investigate and advise the court under section 361.5(c)(3), that failure does not affect our analysis, because it does not show that the trial court's findings under section 361.5(c)(3) were supported by competent testimony. They were not.[10]

For all of these reasons, we conclude that the record does not contain competent testimony to support the juvenile court's order granting reunification services to Mother and Father as to A.E.1 under section 361.5(c)(3).

## DISPOSITION

The portions of the dispositional orders of April 5, 2018, granting reunification services to Mother and Father for M.E., D.E.1, D.E.2, S.E., A.E.1, and A.E.2 are reversed. The dispositional orders are otherwise affirmed. The matter is remanded to the

---

[10] Mother cites *In re Rebekah R.* (1994) 27 Cal.App.4th 1638 in support of her argument, but we find that opinion's analysis unpersuasive. In *Rebekah R.*, the juvenile court denied reunification services to the father, and the Court of Appeal reversed on the ground that because "the department did not satisfy its investigatory obligation" under (what is now codified as) section 361.5(c)(3), "the juvenile court's order denying the father reunification services is not supported by substantial evidence." (*In re Rebekah R. supra*, at p. 1656.) That analysis would appear to be unsound. Once the juvenile court finds that section 361.5(b)(5) applies, section 361.5(c)(3) requires the court to deny reunification services unless the court makes a countervailing factual finding that services are likely to prevent reabuse or that denial of services would be detrimental because the child is closely and positively attached to the parent. It appears that the trial court in *Rebekah R.* made no such countervailing finding and accordingly denied reunification services, as required by statute. *Rebekah R.* does not explain how the department's failure to provide additional information on the relevant issues could show that the trial court's failure to make the necessary countervailing finding is not supported by substantial evidence. On the contrary, if the trial court did not have sufficient evidence to make the necessary findings under section 361.5(c)(3), then the court did exactly what it was required to do, namely, order no services.

juvenile court with directions to enter a new order denying reunification services to both Mother and Father as to all of the children and setting a selection and implementation hearing under section 366.26.

CERTIFIED FOR PUBLICATION

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

SLOUGH
J.