Filed 1/12/23  P. v. Yin CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B316810 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA082953) |
| v. | |
| JASON CHEN YIN, | |
| Defendant and Appellant. | |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County.  William C. Ryan, Judge.  Affirmed.

Innocence Legal Team and William P. Daley for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy

Attorney General, and David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.

_____

Jason Chen Yin was convicted in 2013 of arranging a meeting with a minor and going to the arranged meeting place to engage in lewd or lascivious behavior (Pen. Code, § 288.4, subd. (b))[1] and contacting the minor with intent to commit a sexual offense (§ 288.3, subd. (a)). The trial court denied Yin's motion for a new trial after an evidentiary hearing, rejecting the claim Yin's defense counsel had provided constitutionally ineffective representation. We affirmed the ruling denying the new trial motion and the judgment of conviction. (*People v. Yin* (Oct. 14, 2014, B248210) [nonpub. opn.] (*Yin I*).)

In December 2017, released from prison and no longer on parole, Yin filed a motion to vacate his convictions under section 1473.7, subdivision (a)(2), contending new evidence, as set forth in declarations from four long-time family friends, when considered with purported errors at trial, established he was not guilty of the crimes. Following an evidentiary hearing the superior court denied Yin's motion, ruling the testimony of the family friends did not constitute newly discovered evidence and, even if it did, their testimony, when considered in light of the overwhelming trial evidence of Yin's guilt, did not support a claim of actual innocence.

On appeal Yin argues the superior court impermissibly limited the evidence presented at the section 1473.7 hearing, precluding him from pursuing his claim that defense counsel had

_____

[1]    Statutory references are to this code unless otherwise stated.

2

been prejudicially ineffective by providing the prosecution a copy of a confidential psychological evaluation without Yin's consent. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Yin's Convictions for Contacting a Minor with Sexual Intent and Arranging a Meeting for That Purpose*

   a. *The People's evidence*

The evidence at trial established that in the fall of 2010 Amanda G., then 13 years old and living in Boise, Idaho, created a social media profile with her friend McKenna for a fictional 19- or 20-year-old woman named Amaya who worked at Disneyland. McKenna, using the Amaya profile, chatted online with Yin, whose profile showed his age as 23. McKenna introduced Amanda and Yin to each other online after Amanda told McKenna she was bored.

Amanda and Yin began chatting on November 8, 2010. Their chats quickly became sexually graphic. Amanda offered to send Yin nude pictures but never did notwithstanding Yin's repeated requests. Their chats often referred to Amanda's age. In a chat dated November 10, 2010 Yin stated, "[T]he likelihood of me actually coming to your house to have sex with you at 13 is basically 0." In another chat in which Yin encouraged Amanda to take nude pictures, he said, "Well I guess nothing is illegal if no one finds out." In a chat on November 15, 2010 Amanda indicated she was going to create a new profile, and Yin told her

to use a legal age like 18.[2]  Yin also told Amanda in that chat to make sure she "delete[d] the evidence."

At some point Amanda told Yin that McKenna had fabricated the Amaya profile.  In early December 2010 Amanda's mother called the police after she had discovered the chats between Amanda and Yin.  Amanda advised Yin about this even though she was told not to contact him again.

In early December 2010 Detective Tim Brady of the Boise Police Department began impersonating Amanda online and chatting with Yin.  For the next several months Yin and "Amanda" continued their sexual chat.  (We refer to a detective chatting in Amanda's voice as Amanda for ease of reference.)  In early February 2011 Amanda told Yin her mother was taking her to Los Angeles for spring break and she would have time alone at the hotel.  Yin asked whether they could "fuck there" and posed logistical questions like whether Amanda could get "the pill" or whether he should bring condoms.  Yin wrote, "If something bad between us happen[s] though you won't use this to blackmail me right?"  He also wrote, "I[']m scared mostly because of the age. It'd be better if you were legal . . . so nothing bad would happen at all."  Through February and March 2011 Amanda and Yin continued to chat about whether Yin would meet Amanda in Los Angeles.

On March 18, 2011 Amanda gave Yin the address of a hotel in Glendale.  They chatted for the next several days about arrangements (for example, birth control and security cameras at the hotel) and having sex.  On March 23, 2011 Los Angeles Police

---

[2]    Amanda used her real age of 13 for the new profile with a different screen name and interacted with Yin under that screen name.

Detective Charles Schlund took over chatting as Amanda. After Amanda asked whether Yin would meet her the following day, Yin wrote, "Not sure yet. Most likely. I want to fuck you so bad right now." They continued chatting, with Amanda encouraging Yin to meet her. Amanda asked if Yin would bring her flowers or a teddy bear.

On March 24, 2011 an adult undercover officer pretending to be Amanda called Yin to find out if he was going to show up and told Yin she was in room 309. Yin said he would be there after he picked up some things. Just after 2:00 p.m. Yin arrived and was detained and searched; he had a teddy bear, condoms and lubricant.

Following his arrest Yin signed a written statement that he believed the person he was coming to meet was 13 years old: "I came here to help this 13-year-old girl. Wasn't certain her age, but that's the age I believe. Also, the things in the bag were a distraction. I had no intention of sex and was going to use them as a teaching tool. I also brought my notes so I could study for a while. The teddy bear was a gift to her. The girl was troubled and had a single mom and there was no dad. I was only intending to counsel her."

b. *Yin's testimony*

Yin testified in his defense that he thought Amanda was Amaya—part of her role play—and Amaya had led him to believe she was an adult. If she was a minor, he insisted, he was not going to have a sexual encounter with her.

Yin, who was 23 years old in the fall of 2010, told the jury his life since high school had been devoted to studying. He had received an academic scholarship from the University of Southern California and had bachelor's degrees in biology and

5

neuroscience.  Shy and unable to relate well to people, he had no friends or girlfriends, did not engage in social activities and had never had any sexual experience.

Yin met Amanda online through McKenna pretending to be Amaya.  Amaya's profile indicated she was 20 years old and worked at Disneyland.  Yin and Amaya chatted about her job and engaged in cybersex.  Amanda "randomly showed up one day" in their chats and then contacted Yin online.  At some point Yin saw Amanda's age on her profile.  He testified he should have stopped chatting with her as soon as he saw that, but did not because he thought Amaya and Amanda "might be the same person, she might be an adult."  In Yin's experience it was common for people to lie online about everything, including their age.  When Yin referred to Amanda's age as 13 during various chats, he was simply "follow[ing] along with what her topic was."

Yin never suggested he and Amanda meet, and he was surprised and scared when she suggested it.  He had never met anyone in person whom he had chatted with online and did not want to do so:  "It was just to interact with people."  And, Yin was not sure of Amanda's age:  "If she was a minor, I would look stupid.  I don't want to have sex with minors.  If she is an adult, I have to follow through and I don't know how to do that either."  Yin expressed his reluctance by telling Amanda he was busy and did not know if he would be able to meet her.  Yin testified, "And in the end [the detectives] pretty much played with my emotions and I finally decided to go."  When he showed up to meet Amanda, he brought his school books so he could study if it did not work out.

During cross-examination the prosecutor informed the court at a sidebar conference she intended to impeach Yin with

statements he had made during a voluntary evaluation by Dr. Omar Minwalla, a psychologist with The Institute for Sexual Health, that contradicted his testimony he had never engaged in sex and had not met anyone in person after first meeting online. According to Yin's trial counsel, James Blatt, the confidential report had been provided to the prosecution when he was trying to negotiate a probationary disposition. The prosecutor acknowledged the report could not be used in her case-in-chief, but argued it could be used for impeachment. The court then asked, "[I]s there any disagreement? I think everybody agrees that it's impeachment and so you can ask about it." Blatt did not object.

The prosecutor asked Yin whether he had told Dr. Minwalla he had met two adult women in person after first meeting them online and had engaged in sexual activity with them. Yin testified, "I was too embarrassed that I had no contact with anybody, so I made those things up." Yin further testified he did not recall telling Dr. Minwalla he had engaged in sexually explicit chatting with 10 girls who said they were 16 or 17 years old and it was not correct in any event. He also did not recall telling Dr. Minwalla that twice girls he believed might be 17 years old had masturbated for him via a live webcam feed. When asked whether he had told Dr. Minwalla he probably would have sex with a 14-year-old girl if she "was a ten," Yin testified he had joked with Dr. Minwalla that he was not interested in a 13- or 14-year-old girl unless "she looks like Jessica Alba or something, maybe. . . . Ten means like Jessica Alba or something, which I don't think a 13- or 14-year old could look like Jessica Alba. That is what I meant by that statement."

Asked about the written statement he had signed following his arrest in which he admitted he believed he was meeting a 13-year-old girl, Yin explained it made no sense to tell the police he had come to see a 20-year-old girl because he knew she was not 20 when he encountered the police at the hotel. Additionally, he explained, the police "pretty much told me what to write."

2. *The Motion for a New Trial*

After the jury found him guilty on both charges, Yin, represented by new retained counsel, moved for a new trial on the ground he had received ineffective assistance from Blatt, who allegedly engaged in unethical conduct and coerced him to testify untruthfully. Yin asserted he had explained that role players create elaborate stories about their characters and staying in character at all times is essential to keep people interested and engaged. Yin believed Amanda was a role-play character of 20-year-old Amaya, of whom he had seen several pictures, and never suspected Amanda and McKenna had created Amaya. Yin also told Blatt he had gone to great lengths to verify the ages of two other women, Chezea Edgar and Katrina Gordon, he had met online before engaging in sexual activity with them. Yin provided contact information for Edgar and Gordon, a detailed description of the steps he had purportedly taken to verify their ages and contact information for friends who could corroborate portions of what he said. According to Yin and his parents, who had retained Blatt and were involved in discussions with him about Yin's defense, Blatt dismissed Yin's explanation as too complicated to present to a jury. The Yins, however, believed Yin's explanation and pattern of age verification were essential to his defense.

8

According to Yin, Blatt told him what to say when he testified, specifically to appear naive and sexually inexperienced. In his declaration Yin stated Blatt told him his theory of the case for the first time two days before trial: "I was to be totally sexually naive (a lie). I was to never have had sex (a lie). I was to act humble in front of the jury. I was to have no[] friends (a lie), buddies (a lie), or social activities (a lie). I was to only study (a lie). I was to have never actually met any person online and then met them in person (a lie). . . . If when I got to the hotel, there had been a 13 year old girl there, I would not have done anything (true). If when I got to the hotel, there was an adult female there, I was to say I was too inexperienced to know what to do with her (a lie). . . . I knew that I had told Dr. Minwalla about the two women I had met on the Internet and had sex with one of them. Mr. Blatt said I should say that I told this to Dr. Minwalla because I was embarrassed I was a virgin."

At the hearing on the new trial motion Blatt testified he did not call Edgar or Gordon in Yin's defense because they had failed to corroborate Yin's contention he verified their ages before engaging in any sexual activity: "[Yin] indicated to me that he specifically requested their identification, and these witnesses were adamant that there was never an effort made to find out their true age." Blatt recalled that Yin's parents were dissatisfied with the information Blatt's investigator had learned when interviewing Edgar and Gordon, which directly contradicted Yin's description of the events, and wanted them re-interviewed, which Blatt felt was an attempt to coerce favorable statements from them. Blatt also testified he questioned whether Yin had actually had sexual relations with either woman but believed, even if he did, it did not support the defense theory that

9

Yin did not intend to have sex with Amanda if she could not verify she was at least 18 years old.

Blatt advised the Yins he believed there was a high likelihood of a conviction and a state prison sentence based on the final chats that made it clear Yin knew Amanda's age and was trying to have a visit without being detected. Blatt testified he was able to obtain a no-state-prison offer from the People based, in part, on the psychologist's report he had obtained. Yin, however, refused to consider the offer as long as there was a registration requirement.

The court denied the motion for new trial. The court found Yin lacked credibility based on his demeanor and trial testimony. In contrast, the court found Blatt "extremely credible. He gave sound reasoning for his decisions, strategic decisions at trial, and he based those sound decisions on the information that he was provided at that time and what he believed to be in the best interest of the case."[3]

3. *Yin's Direct Appeal*

On appeal Yin argued the trial court erred in denying his motion for a new trial based on Blatt's ineffective representation in preparing for and defending him at trial. Applying the required deferential standard of review to the trial court's express and implied findings and accepting its credibility determinations, we affirmed the ruling Blatt had acted reasonably in defending Yin. (*Yin I*, *supra*, B248210.) We explained, "Blatt made a strategic decision to present only

---

[3] After denying the new trial motion the trial court sentenced Yin to an aggregate state prison term of three years four months (with 480 days of custody credits).

limited evidence of online role playing and Yin's purported belief that Amanda was a fictional minor created by adult Amaya rather than the other way around.  Instead, he emphasized Yin's immaturity and sexual inexperience to argue Yin did not have the intent to commit a sexual act with anyone, let alone a minor.  Blatt elected to defend Yin this way because he did not believe, nor did Edgar or Gordon corroborate, Yin's explanation he had intended to verify Amanda's actual age before engaging in any sexual activity or that Yin had previously had sex with individuals he had met online but only after confirming they were adults.  Blatt also thought a more detailed age play/role-play-within-a-role-play defense was too complicated for the jury to understand."

Although additional investigation by Yin's new, posttrial counsel suggested the two women may have been more helpful than Blatt believed based on the report from his investigator, we held substantial evidence supported the trial court's finding that Blatt's pretrial investigation was adequate:  "While the investigator's report was cursory, there was nothing on its face to alert Blatt that [the investigator] had failed to ask additional questions that may have corroborated portions of Yin's version of events."

More troublesome, we observed, was Blatt's apparent failure to fully appreciate the potential negative impact of information in Dr. Minwalla's report when used to impeach Yin's effort to portray himself as a naive, socially awkward young man without any prior sexual experience whatsoever and, as a result, to undermine his credibility in general.  (We noted the trial court, in denying the new trial motion, necessarily accepted that Blatt sincerely doubted Yin had ever had sex with anyone, including

Edgar and Gordon, and did not knowingly encourage him to lie about his social life or sexual history.)  Yin's posttrial declaration stating Blatt advised him to deflect questions about these inconsistencies by claiming he was embarrassed by his inexperience and lied to Dr. Minwalla about past sexual episodes demonstrated that Blatt anticipated possible cross-examination based on the report.  But given the inflammatory nature of some of Yin's comments (for example, that he would have sex with a 13-year-old if she was sufficiently attractive), Blatt could have done more, we wrote, at least raising the report during his direct examination of Yin and presenting the explanation for the inconsistencies in a more forthright manner.

Nonetheless, even if Blatt's handling of the report fell below an objective standard of reasonableness based on prevailing professional norms, we held, there was no prejudice: "Given the strength of the evidence against Yin—his admission to the police following his arrest that he came to the hotel to 'help this 13-year-old girl'; the repeated references to Amanda's age during their Internet chats; and the elaborate preparations for what was intended to be a real-life meeting, not continued role play, that included extensive planning to avoid detection by Amanda's mother or security cameras and concluded with Yin's arrival at the arranged meeting place with a teddy bear and lubricants—it is not reasonably probable that a different approach to the Minwalla report would have led to a result more favorable to Yin." (*Yin I*, *supra*, B248210.)

Our analysis of this aspect of Yin's claim of ineffective assistance of counsel assumed the People were entitled to use the report to impeach Yin at trial and, as discussed, evaluated the quality of, and absence of prejudice from, Blatt's treatment of

12

that evidence.  In a footnote we pointed out that Yin's newly retained counsel during the evidentiary hearing on the new trial motion had not asked Blatt about his decision to provide the report to the prosecutor in an attempt to negotiate an acceptable pretrial resolution of the case, including whether Blatt notified Yin in advance or discussed with the prosecutor potential use by the People of the report at trial if there was no negotiated plea agreement.  In the absence of any testimony on these points from Blatt, we explained, Yin's claim Blatt's disclosure of the report constituted ineffective assistance of counsel was not properly resolved on direct appeal.  (*Yin I*, *supra*, B248210, fn. 11.)

4. *Yin's Petition for Writ of Habeas Corpus*

In February 2015 Yin filed a petition for a writ of habeas corpus, arguing Blatt's disclosure of Dr. Minwalla's report to the prosecutor constituted ineffective assistance of counsel.  The petition was considered by Judge Michael Carter, who had presided at Yin's trial.  After reviewing the petition and the trial transcript, the court denied the petition for failure to show a prima facie case for relief.

In his ruling, filed July 6, 2015, Judge Carter, after noting the issue had been addressed at trial and again in Yin's motion for a new trial, explained the report had been disclosed to help facilitate a favorable plea deal and with the understanding that the People would not use the contents of the report against Yin in their case-in-chief.  As discussed at a sidebar conference, "It was not until the petitioner chose to lie on cross-examination that the report became admissible as impeachment."

The court continued, "During the motion for new trial, trial counsel was examined on the issue of the disclosure of the report. Trial counsel indicated that [he had] discussed the [strategy] of

13

using the petitioner's background and upbring as mitigation. This discussion was with the petitioner and his parents. The discussion included the need to turn over the information to the Court and the People for that limited purpose." Because there was no showing of prejudice from Blatt's disclosure of the report, the petition was denied.

Yin's section 1473.7 motion stated he had been discharged from parole by the time the superior court denied his petition. Because he was no longer in actual or constructive criminal custody, Yin explained, he had no standing to seek relief from this court following the superior court's denial of his habeas petition.

5. *Yin's Section 1473.7 Motion*

Enacted in 2016 by Assembly Bill No. 813 (2015-2016 Reg. Sess.) (Stats. 2016, ch. 739, § 1), effective January 1, 2017, section 1473.7 authorizes a person no longer in criminal custody to file a motion to vacate a conviction on specified grounds, including newly discovered evidence of actual innocence (§ 1473.7, subd. (a)(2)). On December 27, 2017 Yin filed a motion, and on January 23, 2018 an amended motion, under section 1473.7, subdivision (a)(2), attaching declarations from four individuals—friends of Yin and his family—who had not testified at trial. Yin argued this new evidence, when considered with the errors at trial (in particular, Blatt's purported ineffective assistance in providing Dr. Minwalla's report to the prosecutor), established he was not guilty of the crimes for which he had been convicted.

After receiving an opposition from the People and a reply memorandum from Yin, the court set the matter for an evidentiary hearing as required by section 1473.7,

14

subdivision (d), but limited the scope of evidence to be presented to the issue of newly discovered evidence of actual innocence.[4] The court rejected Yin's contention he was entitled to have his claim that Blatt provided ineffective assistance by disclosing the psychologist's report to the prosecutor determined as part of the evaluation of the new evidence submitted in support of the motion to vacate the convictions. Acknowledging that section 1473.7, subdivisions (a)(2) and (e)(1), provide the court shall grant the motion if the moving party establishes newly discovered evidence of actual innocence exists requiring the convictions be vacated "as a matter of law or in the interests of justice," the court ruled "the phrase 'in the interests of justice' is not a freestanding catch-all authorization to bring any claim that a defendant believes should be resolved in the interests of justice. . . . [I]t is clear that the phrase 'in the interests of justice' relates directly to newly discovered evidence of actual innocence that requires vacation of the conviction or sentence."

At the court's direction Yin presented as witnesses at the September 2, 2021 evidentiary hearing the four individuals who had provided declarations in support of his motion. Mark Fiji, a close friend of Yin's family, testified that in early 2011 Yin told him he was chatting with someone online. Yin said the person was 19 years old but added you could not be sure about someone you met online. David Zhang, a family friend who had known Yin since late elementary school or middle school, testified that in March 2011 Yin told him he was speaking online with a 19-year-old girl, mentioned she was showing signs of depression and said

---

[4] Yin's Penal Code section 1473.7 motion was heard by Judge William C. Ryan, after Yin challenged Judge Carter pursuant to Code of Civil Procedure section 170.6.

15

he might go and see her in person if he felt that was something he should do. Jamie Lyn Fong and Yvonna-Marie Barrientos, both acquainted with Yin while they were all growing up, testified to Yin's general character, stating he never made them feel uncomfortable or acted inappropriately with them. All four of the witnesses indicated they were not very familiar with Yin's dating life and were surprised that he had been convicted of sex crimes involving a minor.

The court received into evidence the People's exhibits, which included Amanda G.'s, Detective Brady's and Detective Schlund's trial testimony.

After taking the matter under submission, the superior court denied Yin's motion. The court ruled none of the testimony constituted newly discovered evidence of actual innocence within the meaning of section 1473.7, subdivision (a)(2): "The witnesses' familiarity with [Yin's] character and their limited knowledge of his personal life[are] not newly discovered evidence as [Yin] knew these friends and his relationships with them for many years."

Even if it were properly considered as newly discovered evidence, the court also ruled, the evidence did not support Yin's claim of actual innocence: "Aside from the evidence from his witnesses that [Yin] was kind and helpful in academic and professional advice and the surprise that he was convicted, the testimony from all four witnesses offered very light insight into [Yin's] character, specifically as it related to dating, the opposite sex, his past or present love interests, or any overarching morals or principles [Yin] lived by." In contrast, the court explained, the trial evidence of Yin's guilt was overwhelming. Nor was there any basis for finding Blatt ineffective for failing to call these witnesses at trial: "There was no evidence presented to show

16

that [Yin] ever told trial counsel about these four character witnesses."

Yin filed a timely notice of appeal.

## DISCUSSION

Section 1473.7, subdivision (a)(2), authorizes a person no longer in criminal custody to file a motion to vacate his or her conviction if "[n]ewly discovered evidence of actual innocence exists that requires vacation of the conviction . . . as a matter of law or in the interests of justice." Section 1473.7, subdivision (e)(1), places on the moving party the burden of establishing by a preponderance of the evidence the existence of the grounds for relief.

As Yin emphasizes in his appellate briefs, section 1473.7 was enacted in 2016 at the same time as the Legislature amended section 1473, specifying nonexclusive grounds for habeas corpus relief, by adding subdivision (b)(3), which provides a petition for writ of habeas corpus may be pursued if "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome of trial." (§ 1473, subd. (b)(3)(A).)[5] Prior to this amendment a petitioner was entitled to habeas corpus relief on the ground of newly

---

[5]     Assembly Bill No. 813 (2015-2016 Reg. Sess.) (Stats. 2016, ch. 739, § 1), which enacted section 1473.7, passed both houses of the Legislature on August 31, 2016 and was signed by the Governor on September 28, 2016. Senate Bill No. 1134 (2015-2016 Reg. Sess.) (Stats. 2016, ch. 785, § 1), which amended section 1473, passed both houses of the Legislature on August 25, 2016, and was also signed by the Governor on September 28, 2016.

discovered evidence only if the new evidence "cast[] fundamental doubt on the accuracy and reliability of the proceedings." (*In re Lawley* (2008) 42 Cal.4th 1231, 1239, internal quotation marks omitted; accord, *In re Hall* (1981) 30 Cal.3d 408, 423.)

As the court of appeal explained in *In re Sagin* (2019) 39 Cal.App.5th 570, 579-580, the principal case relied upon by Yin, "That former standard required a petitioner to conclusively establish innocence. [Citation.] Habeas corpus relief was thus previously reserved for those cases where newly discovered evidence essentially on its own proved a petitioner did not commit the crime. The amendment to Penal Code section 1473 changed that. A petitioner no longer has to prove innocence but rather must show that the new evidence—viewed in relation to the evidence actually presented at trial—would raise a reasonable doubt as to guilt. The statute creates a sliding scale: in a case where the evidence of guilt presented at trial was overwhelming, only the most compelling new evidence will provide a basis for habeas corpus relief; on the other hand, if the trial was close, the new evidence need not point so conclusively to innocence to tip the scales in favor of the petitioner." (Fn. omitted.)

In section 1473.7, subdivision (a)(2), the Legislature specified a successful motion to vacate a conviction must present newly discovered evidence of actual innocence—not, as it did in new section 1473, subdivision (b)(3), that relief is available if there is newly discovered evidence more likely than not to have changed the outcome of trial (that is, persuaded at least one juror to vote not guilty). Notwithstanding that very different language in two contemporaneously enacted pieces of legislation, Yin contends inclusion of the "interests of justice" standard in

18

section 1473.7, subdivision (a)(2), requires an analysis even broader than in habeas proceedings. The interests of justice, he asserts, "necessarily includes all of the trial, including significant errors by the defense." Thus, Yin argues, it was error for the superior court not to consider the unresolved ineffective assistance issue and determine whether a more favorable trial outcome would have been likely if the new evidence by his four family friends had been presented and Dr. Minwalla's report had never been turned over to the prosecutor. He urges us to reverse the order denying his motion and remand for a new hearing to include testimony concerning Blatt's purported ineffective assistance, as well as the new evidence previously presented.

Given the significant difference in statutory language, it requires a considerable analytic leap to conclude the Legislature intended section 1473.7, subdivision (a)(2), to serve as a vehicle for a person no longer in criminal custody to effectively replicate a habeas corpus proceeding under section 1473, subdivision (b)(3)(A), allowing litigation (or relitigation) of purported trial errors, provided only that some newly discovered evidence is presented that might have supported the defense theory of the case. (See *Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1343 ["'[w]here a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent'"]; *Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 ["[o]rdinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning"].) Certainly nothing in

19

the legislative history of Assembly Bill No. 813 (2015-2016 Reg. Sess.) reveals such an intent or, for that matter, supports any interpretation of section 1473.7, subdivision (a)(2), different from the plain meaning of the phrase "newly discovered evidence of actual innocence." (See *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 412 [""[a]n intent that finds no expression in the words of the statute cannot be found to exist""]; *La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461, 476 [same].)

We need not resolve that issue, however. As the superior court ruled, Yin failed to present any "newly discovered evidence," and thus failed to demonstrate at the threshold his eligibility for relief under section 1473.7, subdivision (a)(2). To be sure, section 1473.7 does not define the phrase "newly discovered evidence." But it is defined in section 1473, subdivision (b)(3)(B), as "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching," a definition that is consistent with others in the Penal Code. (See *People v. Perez* (2020) 47 Cal.App.5th 994, 999 ["newly discovered evidence" for purposes of section 1473.7, subdivision (a)(2), is properly understood as the phrase has been consistently defined elsewhere in the Penal Code, including sections 1181, subdivision 8, and 1473.6, subdivision (b), as evidence "that with reasonable diligence could not have been discovered earlier," italics omitted]; see also *In re Hardy* (2007) 41 Cal.4th 977, 1016 [in the context of a claim that habeas corpus relief is available when newly discovered evidence demonstrates actual innocence, ""newly

20

discovered evidence" is evidence that could not have been discovered with reasonable diligence prior to judgment'"].)

Testimony from two family friends concerning conversations Yin had with them in early 2011 prior to his arrest and from two others regarding his general character falls far short of satisfying that requirement. As the trial court observed, Yin was aware of these individuals and his interactions with them for many years, including at the time of trial.

In his moving papers Yin consistently referred to his friends' testimony as "new evidence," never as "newly discovered evidence," suggesting he recognized (though not admitting) he could not carry his initial burden in moving for relief under section 1473.7, subdivision (a)(2). Indeed, on appeal, even though the first ground for the superior court's ruling denying his motion was the absence of newly discovered evidence, Yin still does not attempt to explain why his friends' testimony could not have been discovered earlier, let alone why his failure to present "newly discovered," not simply "new," evidence does not necessarily defeat his motion. (See *People v. Perez*, *supra*, 47 Cal.App.5th at p. 1000 ["[d]efendant did not put forward any newly discovered evidence, and therefore has failed to demonstrate eligibility for relief under section 1473.7"].) Yin's motion was properly denied.

21

## DISPOSITION

The postjudgment order denying the motion is affirmed.


PERLUSS, P. J.


We concur:


SEGAL, J.


HOWARD, J.*

---

* Judge of the Marin County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22